Luis G. CABRERA, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 147, 2002, 209, 2002.

Supreme Court of Delaware.

Submitted: Nov. 4, 2003.

Decided: Jan. 27, 2004.

---

**26.** *Pike Creek Chiropractic Center, P.A. v. Robinson,* 637 A.2d 418, 422 (Del.1994).

John P. Deckers, Esquire (argued), and Michael C. Heyden, Esquire, Wilmington, Delaware, for Appellant.

Timothy J. Donovan, Jr., Esquire, Thomas E. Brown, Esquire (argued), and Elizabeth R. McFarlan, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

Luis G. Cabrera was found guilty of two counts of first-degree murder and sentenced to death for the murders of Brandon Saunders and Vaughn Rowe. In this direct appeal, Cabrera asserts five grounds for reversal of his conviction and sentence. Because this is an appeal in a death penalty case we apply a high degree of scrutiny to the five issues for our review. As to all five issues we find no reversible error, and we affirm the judgment of the trial court.

### Summary of Conclusions Reached on Appeal

#### 1. The Belt and Patterned Injury Evidence

We have considered whether the trial court properly admitted the belt and the expert testimony evidence relating to the patterned injuries found on Rowe's body. We conclude that although the Superior Court found that the State had violated discovery rules by failing to produce this evidence until immediately before the start of the trial, the Superior Court did not abuse its discretion by admitting the evidence. The Superior Court has broad discretion to fashion remedies for discovery violations. Cabrera did not suffer significant prejudice from the discovery violation, and the court therefore acted within its discretion when it admitted the evidence.

We also conclude that the Superior Court did not abuse its discretion by admitting the physical evidence. The evidence was properly authenticated to be admissible under Rule 901.[1]

#### 2. Cabrera's Motion for a New Trial and the Mathis Testimony

We have considered whether the Superior Court properly denied Cabrera's motion for a new trial following a witness' purported recantation of her trial testimony. Because the testimony demonstrating the recantation constituted inadmissible hearsay, the Superior Court did not consider it when deciding the motion for a new trial. The Superior Court did not abuse its discretion in denying the motion.

#### 3. The Powell Testimony and the Alleged *Brady* Violation

Cabrera contends that the State's partial disclosure of information about witness

---

1. See DEL. UNIF. R. EVID. 901 (describing the "requirement of authentication or identification as a condition precedent to admissibili-ty" of evidence and providing illustrations of how this requirement may be satisfied).

Keith Powell constituted a violation of the State's obligation to disclose information in its possession that will aid the defendant in preparation of his defense. Because the evidence withheld by the State was not favorable to Cabrera, we hold that the State was not required to disclose it, and, therefore, no *Brady*[2] violation occurred. The Superior Court, therefore, did not err by refusing to strike the testimony.

4. Prosecutorial Comments on Cabrera's Statements During Allocution

Cabrera argues that in closing remarks to the jury during the penalty phase the prosecutor impermissibly commented on Cabrera's failure to express remorse during his allocution, thereby violating Cabrera's constitutional protection against self-incrimination. We conclude that the remarks were not improper because the jury would not naturally and necessarily take the prosecutor's remarks to be a comment on Cabrera's failure to testify.

5. The Constitutionality of the 1991 Death Penalty Statute

We have considered whether the Delaware death penalty statute in effect when Cabrera was sentenced was unconstitutional. Delaware precedent has definitively answered this question in the negative

under the circumstances of this case.[3] Cabrera was properly sentenced under a valid death penalty statute.

Accordingly, we have found no reversible error committed by the trial court and no basis to vacate the death sentence on the five issues summarized above. We also have performed our statutorily mandated proportionality review[4] and conclude that Cabrera's sentence was proportionate. We therefore affirm the judgment of the Superior Court.

### Facts

On January 21, 1996, a pedestrian discovered the bodies of Brandon Saunders and Vaughn Rowe in a wooded area of Rockford Park. The victims appeared to have been killed and then dragged to the location in the woods, where they were covered in a maroon bed sheet. Both victims had been shot in the back of the head. Rowe had also been beaten. Wilmington Police Detective Mark Lemon was assigned as the chief investigator.

Police eventually regarded the defendant, Luis Cabrera, as a suspect. Several items of physical evidence linked Cabrera to the victims. Within a week of the murders, Cabrera returned to a store in Wil-

---

**2.** *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("We now hold that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

**3.** *See Swan v. State,* 820 A.2d 342 (Del.2003) (holding that a jury's conviction of a defendant unanimously and beyond a reasonable doubt for a crime that itself established a statutory aggravating circumstance satisfied the constitutional requirements set forth in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), by providing a jury determination of the factor that rendered the

defendant "death eligible"); *see also Reyes v. State,* 819 A.2d 305, 316 (Del.2003) ("When the very nature of a jury's guilty verdict simultaneously establishes [a] statutory aggravating circumstance ..., that jury verdict authorizes a maximum punishment of death in a manner that comports with the United States Supreme Court's holding in *Ring.*").

**4.** *See* DEL. CODE ANN. tit. 11, § 4209(g) (2001) (providing for automatic review by this Court of all death penalty judgments to ensure that the sentence was neither arbitrarily nor capriciously imposed, the evidence supports the finding of a statutory aggravating circumstance, and the sentence is proportionate to the penalty imposed in similar cases).

mington a pager belonging to Saunders. Cabrera later told the police that he had found the pager on the ground near his father's home. Police also recovered from Rowe a watch that was programmed with the phone number to Cabrera's father's home. When police searched Saunders' bedroom, they found an ISS Servicesystem business card on which was written "434–6154 Big Lou." Cabrera and Luis Reyes, who also was charged and convicted in connection with the murders, both worked at ISS. Some people knew Cabrera as "Big Louie" and Reyes as "Little Louie."

Cabrera was indicted in December 1999, nearly four years after the homicides.[5] He was indicted on two counts of Murder First Degree, two counts of Possession of a Firearm During the Commission of a Felony, and two counts of Conspiracy First Degree. The State sought the death penalty.

At trial, Donna Ashwell, Cabrera's neighbor, testified that she heard an argument in their common basement one Saturday evening in January 1996, sometime before 9:30 or 10:00. She recognized Cabrera's voice and heard a loud crash. Ashwell went to the basement door to investigate and saw Reyes, who, in response to Ashwell's inquiry about the noise, told her they would leave. Later that evening, Cabrera apologized to Ashwell for making so much noise. Ashwell later discovered that a shovel she had used to clear snow was missing.

Cabrera's wife testified that she and Cabrera married in December of 1994 and lived together until October of 1995. She believed that Cabrera later left their apartment in the fall of 1996 and began living with his father. She testified that she and Cabrera had owned a set of burgundy-colored sheets that she did not take with her when she left. In April of 1997, Detective Lemon seized a maroon bed sheet from the basement of Cabrera's father's home, where Cabrera slept. An FBI forensic examiner testified that the flat sheet covering the bodies appeared to match the fitted sheet seized from Cabrera's residence.

An ATF firearms and toolmarks examiner analyzed the ballistics evidence, comparing the bullets found in the victims' bodies with a handgun that was owned by Cabrera's father and seized from the Cabrera residence. The ATF examiner testified that the bullet recovered from Rowe's body had been fired from the Cabrera handgun.

Detective Lemon also seized numerous belts from the Cabrera residence in April of 1997. Mileka Mathis testified at trial that she met Cabrera in 1994 and had sporadic sexual encounters with him over the course of several years.[6] Mathis testified that she was familiar with Cabrera's clothing style and identified a distinctive belt seized from his residence as one that he likely would have worn. She also stated, however, that she did not specifically recognize the belt. Dr. Richard Callery testified that during the January 1996 autopsy of Mr. he observed an injury that resembled the imprint of a belt buckle. Two weeks before his testimony in 2001, Dr. Callery measured one of the belts seized by Lemon and compared it to photographs of Rowe's injuries. He opined that the belt was consistent with one that might have caused the injuries.

---

**5.** Sentencing Decision, *State v. Cabrera*, C.A. Nos. IN–99–04–0314 through IN–99–04–0319, at 1, 2002 WL 484641 (Del.Super.Ct. Mar. 14, 2002).

**6.** Mathis also believed she was the sister of one of the victims and that she had borne Cabrera's child.

The defense strategy focused on highlighting gaps in the circumstantial evidence presented by the State and questioning and contradicting the reliability of the opinions of the State's expert witnesses. The defense also presented the testimony of Keith Powell, a friend of Saunders and Rowe. Powell testified that he, the victims, and Kim Payne had been smoking marijuana at Saunders' home during the evening before the victims' bodies were discovered. Saunders then received a page from someone. The four teenagers left the house; Saunders explained he was going to get more marijuana. Powell estimated that he left Saunders' home between 10:30 and 11:30 that night. The State impeached the credibility of Powell's testimony with his prior inconsistent statements and poor recollection, by demonstrating that he was frequently high during that period of his life and by showing that he was not sure whether he saw the victims on a Friday or a Saturday night. The State also called Kim Payne to testify that she had never been at Saunders' home when Powell was there.

The jury found Cabrera guilty of all charges. At the penalty phase, the court instructed the jury to find the existence of a statutory aggravating factor. The jury found the statutory aggravating factor by unanimous vote. Then, by a vote of eleven to one, the jury found that the aggravating circumstances outweighed the mitigating circumstances. The sentencing judge sentenced Cabrera to death on both counts of murder.

### The Belt and Patterned Injury Evidence

One month before the start of trial, the State first announced that it intended to introduce expert testimony that would draw a connection between the patterned injuries observed on Rowe and a belt seized from Cabrera's residence in 1996. Cabrera moved in limine to exclude the testimony. He argued that the State had violated discovery rules by failing to announce its intent to present such evidence earlier in the proceedings and in response to specific discovery requests made by Cabrera. Cabrera also argued that the State could not properly authenticate the belt and it was therefore inadmissible. Cabrera renews these arguments on appeal.

During 2000, the State provided the defense with certain information in response to Cabrera's discovery requests. After a third conference at which discovery issues were addressed, Cabrera made a detailed request for discovery in May 2000, attempting to determine all expert testimony that would be offered by the State. Cabrera specifically asked whether the State had compared the belts with Rowe's wounds. The State responded that no comparison had been requested or made. On January 9, 2001, the first day of jury selection, the State indicated it would seek to offer comparison testimony and the defendant moved to suppress it.[7] The Superior Court ruled that comparison testimony would be inadmissible because of discovery violations as well as evidentiary problems.

The State moved for reconsideration of that ruling, after asserting that it could establish that Cabrera owned the belt around the time of the offenses. The court ultimately ruled that the belt would be admissible because the State could authenticate it with the newly proffered evidence. The court also ruled that the State could introduce photographic overlays

---

7. The State explained the delay by stating that after the court ruled in December 2000 that a confession by Cabrera would be suppressed, the State had to rethink its trial strategy with an eye toward presenting additional evidence of Cabrera's guilt.

demonstrating the similarity between Rowe's patterned injuries and the belt. Fearing standardless speculation by the jury concerning such evidence, Cabrera withdrew his objection to expert testimony regarding the patterned injuries. Cabrera argues that the trial court ruling suppressing the expert testimony but allowing the belt and photographic overlays was an insufficient sanction for the State's discovery violation. He argues that the court should have deemed all the evidence inadmissible.

■ We review for abuse of discretion the sanction imposed by a trial court because of a discovery violation.[8] We may reverse the Superior Court's decision only if it was clearly erroneous.[9] This Court also reviews for abuse of discretion a trial court's decision that evidence has been properly authenticated.[10]

### The Trial Court's Sanction for the State's Discovery Violation

■ The trial judge has broad discretion to fashion the appropriate sanction for a discovery violation.[11] When deciding whether sanctions should be imposed, the trial court should consider all relevant factors, including " 'the reasons for the State's delay and the extent of prejudice to the defendant." ' [12] In selecting an appropriate sanction, the trial court should also " 'balance the needs of society with the defendant's right to a fair trial." ' [13] The trial court has discretion to cure the violation, if possible, rather than exclude the evidence.[14]

Cabrera did not suffer significant prejudice from the State's discovery violation. Although the State announced only a short time before trial its intention to present the evidence, Cabrera had known for several years that the State possessed the belt. In addition, despite the State's late proffer of the evidence, Cabrera had sufficient time to secure an expert witness to rebut the State's expert witness.[15] The court granted a recess to allow Cabrera's counsel time to locate and prepare a rebuttal expert.[16] The Superior Court did not abuse its discretion by allowing the State to introduce the belt and patterned injury evidence despite the State's discovery violation.

### Admissibility of the Belts and Patterned Injury Evidence Under Rule 901

■ The Superior Court also acted within its discretion when it admitted the physical evidence under Delaware Uniform

---

8. *DeJesus v. State,* 655 A.2d 1180, 1207 (Del. 1995).

9. *Seward v. State,* 723 A.2d 365, 374 (Del. 1999).

10. *Taylor v. State,* 777 A.2d 759, 771 (Del. 2001).

11. *Seward,* 723 A.2d at 374; *DeJesus,* 655 A.2d at 1207.

12. *Seward,* 723 A.2d at 374 (quoting *Snowden v. State,* 677 A.2d 33, 39 (Del.1996)).

13. *Id.*

14. *Id.* at 375.

15. Dr. Callery, the medical examiner, testified for the State. Dr. Ali Hameli, former Delaware Chief Medical Examiner, testified for the defense.

16. *Cf. Seward,* 723 A.2d at 375 (upholding the trial court's admission of a medical examiner's report, provided by the State to the defendant five days before trial, where the trial court gave the defendant an opportunity to seek a continuance but the defendant "declined this opportunity on the basis of prejudice without any further explanation of what prejudice" had occurred); *Doran v. State,* 606 A.2d 743, 745 n. 3 (Del.1992) (stating that the trial court should consider the feasibility of curing any prejudice caused by a discovery violation by granting a continuance or recess).

Rule of Evidence (D.R.E.) 901. Rule 901 requires adequate authentication or identification of evidence as a condition precedent to its admissibility.[17]

Cabrera claims that the belt was not adequately authenticated because the State failed to prove a connection between the belt, the defendant, and the commission of the crime. Relying on *Whitfield v. State*,[18] he argues that the State's attempt at authentication fails. In *Whitfield*, this Court explained that in order to authenticate a tangible object that has not been positively identified by a witness as the instrument used in the commission of a crime, the State must prove that (1) "the instrumentality is at least like the one associated with the crime," and (2) "the instrumentality is connected to the defendant and the commission of the crime." [19]

The State satisfied the first prong of the *Whitfield* test. The medical examiner testified that the belt seized from Cabrera's residence was "consistent with" an instrument that could cause Rowe's patterned injuries. *Whitfield* requires only a demonstration of similarity, not proof that the instrument was actually used to commit the crime. The State also satisfied the second prong. In *Whitfield*, the Court

held that the State had failed to prove the nexus between a shotgun allegedly used by Whitfield in a robbery and Whitfield himself. In that case, however, the State had recovered the weapon upon arresting another person in an unrelated matter. The State never proved any connection between Whitfield and the other person and offered no evidence regarding the whereabouts of the gun between the time of the robbery and the other person's arrest.[20] Here, in contrast, police had seized the belt from among Cabrera's personal effects at Cabrera's father's residence, where Cabrera was living at the time of the seizure. The required nexus may be established by circumstantial evidence.[21] Seizure of the belt from among Cabrera's personal effects sufficiently demonstrated a connection between Cabrera and the belt.[22] One of the items located with the belt was the bed sheet that was proven at trial to match the sheet used to cover the victims' bodies. This circumstantial evidence, in addition to the medical examiner's testimony, demonstrated a nexus between the belt and the crime sufficient to authenticate the evidence and permit its introduction at trial.

The burden of authentication is easily

---

17. *See* DEL. UNIF. R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.").

18. 524 A.2d 13 (Del.1987).

19. *Id.* at 16.

20. *Id.* at 15.

21. *Cf. Negron v. State*, No. 472, 1998, 1999 WL 486916, at *2, 1999 Del. LEXIS 155, at *5 (Del. May 18, 1999) (ORDER) (upholding the admissibility of evidence where a circumstantial nexus established the connection between the defendant and the evidence); *cf. also*

*United States v. Gonzalez–Maldonado*, 115 F.3d 9, 20 (1st Cir.1997) ("The notebook was found, along with [an] identification card [belonging to a co-defendant], in a briefcase in [the co-defendant's] room. Such circumstantial evidence is permitted in order to authenticate the item.").

22. The State argues that Mileka Mathis' testimony also demonstrated the connection between the belt and Cabrera. Mathis merely testified that the belt was of a style that Cabrera might have worn around the time of the murders. Because of the weakness of her testimony, we do not rely on it to establish the nexus required for authentication.

met.[23] The State must establish a rational basis from which the jury could conclude that the evidence is connected with the defendant.[24] The link need not be conclusive.[25] An inconclusive link diminishes the weight of the evidence but does not render it inadmissible.[26] The Superior Court did not abuse its discretion by admitting the evidence as properly authenticated. Cabrera could have rebutted the evidence with evidence that he did not own the belt at the time of the murder. Or he could have argued to the jury that the fourteen months between the murder and the seizure of the belt greatly diminished the weight the jury should give to the evidence that he owned the belt and that it was used to beat Rowe before his death. The connection may have been inconclusive, but that fact affected the appropriate weight to be given the evidence, not its admissibility.

### Cabrera's Motion for a New Trial and the Mathis Testimony

Several months after his conviction, Cabrera moved for a new trial based on certain post-trial, out-of-court statements made by Mileka Mathis, the witness who testified that the belt was of a style that Cabrera might have worn around the time of the murders. In certain statements given to Cabrera's counsel after trial, Mathis purported to recant her testimony and claimed that she had been coerced into giving perjured testimony at trial. At an evidentiary hearing on the motion for a new trial conducted by the trial judge, Mathis declined to testify on grounds of self-incrimination. Thus, she became "unavailable" as a witness.[27]

Cabrera's attorneys then sought to introduce Mathis' post-conviction statements. Those statements of the unavailable declarant, Mathis, constitute hearsay because they were offered to prove the truth of their contents. The question before the trial judge, therefore, was whether the post-conviction statements should be admitted under either of two exceptions to the hearsay rule: D.R.E. 804(b)(3) that pertains to statements against interest, and D.R.E. 807, the "residual exception" relating to statements not covered by other exceptions "but having equivalent circumstantial guarantees of trustworthiness."[28] The circumstances surrounding this issue, as adduced at the evidentiary hearing, are as follows.

In August 2001, Mathis began writing letters to Cabrera in prison. She wrote more than twenty letters over a three-month period. In September 2001, Mathis spoke with Cabrera's attorneys, indicating that her testimony at trial had been perjured and that Detective Lemon had coerced her into giving the false testimony. She stated that her feelings of guilt caused her to desire to recant her testimony.[29] Mathis asserted that she had no basis for

23. *Whitfield,* 524 A.2d at 16.

24. *Williams v. State,* No. 161, 1989 WL 154710, at *1, 1989 Del. LEXIS 435, at *2 (Del. Dec. 4, 1989) (ORDER).

25. *Ward v. State,* 575 A.2d 1156, 1160 (Del. 1990).

26. *Id.*

27. A witness is deemed unavailable for purposes of exceptions to the hearsay rule if, among other things, she "[i]s exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of [her] statement." DEL. UNIF. R. EVID. 804(a)(1).

28. DEL. UNIF. R. EVID. 807.

29. Mathis also claimed in her post-conviction statements to Cabrera's attorneys that she had a sexual relationship with Lemon for several years and that she had known Lemon for one or two years before Cabrera's arrest.

testifying about what type of clothing Cabrera typically wore because she had only a one-night relationship with him. She also claimed she was afraid of how "a certain someone" might react to her recantation. Then, in October 2001, Mathis filed a complaint with the police alleging that Cabrera had written her threatening letters that caused her to recant her testimony. Cabrera denied writing the letters. The defense engaged a handwriting expert who opined that Cabrera had not written the threatening letters submitted to police by Mathis, but rather that Mathis was more likely the author.

At the evidentiary hearing on the motion for a new trial, following Mathis' refusal to testify, Lemon testified that he never had sex with Mathis, denied coercing Mathis into giving perjured testimony and said that Mathis never told him that what he wanted her to say was untrue. Cabrera claims that a new trial should have been granted because of Mathis' recantation of her trial testimony. The State argues that a grant of a new trial would be based on inadmissible hearsay contained in Mathis' statements to defense counsel.

■ We review for abuse of discretion a trial court's denial of a motion for a new trial based on recantation of testimony.[30] We also review for abuse of discretion the trial court's decisions regarding the admissibility of evidence.[31]

■ A trial court should grant a new trial based on a witness' recantation only if (1) the court is "reasonably well satisfied that the testimony given by a material witness is false," (2) without the evidence the jury might have reached a different conclusion, and (3) the false testimony took the party seeking the new trial by surprise and the party was unable to meet it, or the party did not know of its falsity until after the trial.[32] In order to meet the first prong, Cabrera had to show that Mathis' trial testimony was false. The trial judge ruled that Cabrera failed to carry this burden because the hearsay statements were inadmissible and the other evidence at the hearing suggested that it was Mathis' recantation, and not her trial testimony, that was false. Because the trial judge ruled that the hearsay statements were inadmissible, he had no basis on which to conclude that the testimony of a material witness was false. Thus, the key issue is whether the trial judge abused his discretion in refusing to admit Mathis' post-conviction statements in evidence.

### D.R.E. 804(b)(3)

■ In his sixty-two-page, extensive opinion of April 3, 2003, analyzing the facts adduced before him at trial and at the evidentiary hearing on the motion for a new trial, the trial judge ruled that Rule 804(b)(3) did not render Mathis' statements admissible. We have concluded that the trial judge did not abuse his discretion in excluding those statements.

"Hearsay statements are generally not admissible unless the statement falls within a recognized exception to the hearsay rule."[33] Rule 804(b)(3) allows the admis-

---

30. See *Blankenship v. State,* 447 A.2d 428, 433 (Del.1982) ("A Motion for a New Trial based upon a witness' recantation is generally viewed with suspicion, and a denial of such a motion will not be reversed on appeal unless there has been an abuse of discretion.").

31. *Floudiotis v. State,* 726 A.2d 1196, 1202 (Del.1999).

32. *Blankenship,* 447 A.2d at 433 (adopting a test set forth in *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928)).

33. *Culp v. State,* 766 A.2d 486, 489 (Del. 2001).

sion of a "statement against interest" if the declarant is unavailable to testify as a witness.[34] Rule 804(b)(3) also imposes two conditions to the admissibility of hearsay evidence in addition to the declarant's unavailability. First, a statement against interest will be admissible only if it "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true."[35] Second, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused" may be admitted only if "corroborating circumstances clearly indicate the trustworthiness of the statement."[36]

Mathis became unavailable to testify when she invoked her Fifth Amendment privilege at the evidentiary hearing.[37] Mathis' statement that she did not testify truthfully at trial was against her penal interest because it amounted to a "squarely self-inculpatory confession."[38] A reasonable person would know that admitting to giving false testimony would subject the person to criminal liability for perjury. In addition, the State had not offered Mathis immunity from any potential perjury charges and had even threatened to bring perjury charges against her if she recanted her trial testimony.

Mathis' statements, nonetheless, fail the test of admissibility under Rule 804(b)(3) because they lack corroborating evidence. In considering whether corroborating circumstances supported the trustworthiness of Mathis' statements, the Superior Court properly considered whether they were (1) "made spontaneously and in close temporal proximity to the commission of the crime"; (2) "corroborated by other evidence in the case"; and (3) "truly self-incriminatory and against penal interest."[39] The trial judge also appropriately considered Mathis' credibility when considering the corroborating circumstances factor.[40] Rule 804(b)(3) requires that the corroborating circumstances "do more than tend to indicate the trustworthiness of the statement, they must *clearly* indicate it."[41] Cabrera failed to demonstrate that corroborating circumstances clearly indicated the trustworthiness of Mathis' post-conviction statements.

Cabrera argues that Mathis' trial testimony itself corroborates her recantation because of her hesitancy to testify and her halting responses to questions. There is nothing in her trial testimony, however, to indicate that Lemon coerced or coached

---

34. DEL. UNIF. R. EVID. 804(b)(3).

35. *Id.*

36. *Id.; see also Outten v. State,* 650 A.2d 1291, 1296 (Del.1994) ("D.R.E.804(b)(3) allows admission of only truly reliable self-inculpatory statements made by unavailable declarants.").

37. *See* DEL. UNIF. R. EVID. 804(a)(1) (providing that a declarant is unavailable if she is "exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement"); *Demby v. State,* 695 A.2d 1152, 1158 (Del.1997) (stating that a witness was unavailable under Rule 804(a)(1) because he had invoked his Fifth Amendment privilege against self-incrimination).

38. *Williamson v. United States,* 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).

39. *Outten,* 650 A.2d at 1296 (citing *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

40. *See Demby,* 695 A.2d at 1158 (outlining the three *Outten* factors and including "the reliability of the witness who was reporting the hearsay statement" as a fourth factor for consideration).

41. *Outten,* 650 A.2d at 1297.

that testimony. Cabrera also argued in the Superior Court that Mathis' mother and another relative were present when Detective Lemon told Mathis which belt she should choose to associate with Cabrera. Neither Mathis' mother nor her other relative has provided any corroborating testimony, however. Cabrera has failed to adduce corroborating circumstances to show that Mathis' statements were sufficiently reliable to be admissible under Rule 804(3). The Superior Court did not err by excluding them.

The trial judge also focused on the "temporal" issue. Mathis' recanting statement was made more than six months after she testified at trial. Mathis corresponded with Cabrera numerous times before meeting with his attorney. Thus, Mathis's recantation was not spontaneous, but was part of her attempt to build a relationship with Cabrera. The trial judge concluded that such a large temporal gap and lack of spontaneity did not support the admissibility of the statement.

The Superior Court did not abuse its discretion by finding that Mathis' statement was inadmissible under Rule 804(b)(3). Cabrera failed to meet his burden of clearly demonstrating with corroborating circumstances the trustworthiness of the statement.

### D.R.E. 807

 Mathis' statements also were not admissible under Rule 807. That Rule provides an exception to the hearsay rule where a statement has sufficient "circumstantial guarantees of trustworthiness" if the court determines (1) "[t]he statement is offered as evidence of a material fact," (2) "the statement is more probative on the point for which it is offered than any other

evidence which the proponent can procure through reasonable efforts," and (3) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence."[42] The requirements are construed narrowly so that the exception does not swallow the hearsay rule.[43] Mathis' post-trial statements fail to satisfy the requirement that the evidence have circumstantial guarantees of trustworthiness for the same reasons that they were not admissible under Rule 804(3)—they were not supported by sufficient corroborating evidence. In addition, excluding the evidence does not pose a great risk of miscarriage of justice, because Mathis' trial testimony was weak and related to only one small link among several implicating Cabrera in the crime. The Superior Court did not abuse its discretion by denying Cabrera's motion for a new trial because it had no admissible evidence on which to base the granting of a new trial.

### *The Powell Testimony and the Alleged* Brady *Violation*

 Cabrera next claims that the State's disclosure of Powell's exculpatory statements, coupled with its withholding of information regarding Powell's inconsistent statements and other impeaching evidence, constituted a *Brady* violation that violated Cabrera's due process rights. Cabrera asserts that the State lured him into a trap by providing a partial disclosure of what it knew about Powell. Cabrera argues that he detrimentally relied on the State's *Brady* disclosure and that the partial disclosure implicates "basic notions of fairness." We review de novo the Superior Court's formulation and application of

---

**42.** DEL. UNIF. R. EVID. 807.

**43.** *Brown v. Liberty Mut. Ins. Co.,* 774 A.2d 232, 242 (Del.2001).

the law.[44]

■ In *Brady v. Maryland*, the United States Supreme Court held that the prosecution's suppression of exculpatory evidence violates a defendant's due process rights.[45] The State must release evidence to the defendant if (1) "the evidence is requested by the accused but production is withheld by the State," (2) "the information is favorable to the accused's case," and (3) the evidence is material to guilt or punishment.[46]

We focus on the second prong—whether the evidence was favorable to Cabrera's defense—because the other prongs are not in serious contention. We conclude that the evidence on which Cabrera bases his claim of a *Brady* violation was not favorable to the defense. The State therefore was not required to disclose the information.

In *Dawson v. State*, the defendant claimed that the State violated discovery rules by not disclosing, until just before a witness testified, that the witness' testimony had changed dramatically since her initial interview by police.[47] The Court confirmed that *Brady* applies to both exculpatory and impeachment evidence.[48] But its holding also teaches that the State

must disclose impeachment material only if it impeaches evidence that is favorable to the State. In *Dawson*, we held that the defendant had failed to prove a *Brady* violation because

> [t]he information sought was not favorable to Dawson's case, as required by the second prong of the *Brady* test. In fact, Spence's testimony was quite damaging to Dawson's defense theory. Arguably, the information would have allowed defense counsel to prepare better for cross-examination and this enhanced preparation would have been favorable to the defense. This is not, however, the type of situation envisioned by the United States Supreme Court in *Bagley*, where the scope of *Brady* was enlarged to include impeachment evidence. *Bagley* contemplates a situation where the impeachment evidence is directly favorable to the accused, rather than simply providing a basis for investigation.[49]

*Brady* requires the State to disclose information to the defendant only where the information is favorable to the defense. Whether the impeached witness was initially called by the defendant or by the prosecution is not dispositive of the question whether impeachment evidence is favorable to the defendant.[50] The Court

---

44. *See Atkinson v. State*, 778 A.2d 1058, 1061 (Del.2001) (reviewing de novo a defendant's claim that the State failed to turn over *Brady* material).

45. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("We now hold that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

46. *Dawson v. State*, 673 A.2d 1186, 1193 (Del. 1996); *see also Atkinson*, 778 A.2d at 1063 (discussing three components of a *Brady* violation: " 'The evidence at issue must be favorable to the accused, either because it is ex-

culpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued' " (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999))).

47. *Dawson*, 673 A.2d at 1192.

48. *Id.* at 1193 (citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

49. *Id.* (citation omitted).

50. *See In re Sealed Case No. 99–3096 (Brady Obligations)*, 185 F.3d 887, 893–94 (D.C.Cir. 1999) (holding that the fact that the witness

must examine the witness' testimony in relation to the purported *Brady* information to determine whether the information is favorable to the defense.[51] Evidence that impeaches a witness called by the defense may or may not be favorable. Likewise, evidence that impeaches a witness called by the prosecution may or may not be unfavorable.[52]

The evidence used by the State to impeach Powell was not favorable to Cabrera. Powell's testimony on direct examination was favorable to the defense, tending to show that he was with the victims late on the evening of their deaths and contradicting the State's evidence that the violence ending in the murders had begun earlier in the evening. The undisclosed evidence undermined Powell's credibility by demonstrating that he was frequently under the influence of drugs during the time period surrounding the murders and that he could not remember whether he had been with the victims on the evening of their deaths or on an earlier evening. Evidence tending to undermine the credibility of a witness who testified in favor of the defense is not favorable to the defense. Kim Payne's testimony that she was never with the victims when they were with Powell also was not favorable to the defense,

because it similarly undermined the defendant's contention that the violence could not have begun when the State claimed that it had.

Cabrera's claim that he was unfairly surprised by the State's evidence impeaching Powell is without merit. The State disclosed the exculpatory information about Powell and his statements to the police. The State should not be penalized because Cabrera failed further to investigate Powell and his credibility as a witness before calling him to testify.

### Prosecutorial Comments on Cabrera's Statements During Allocution

 Cabrera exercised his right to allocution during the penalty phase. He began by saying, "I would like to first apologize for the grief that I have stricken [sic] to my family and friends. In the same token, I would like to express my condolences to the families of the victims, which I'm pretty sure they don't want to hear anything I have to say, which is understandable because, if I was in their situation, I believe I'd feel the same way." In his closing remarks, and knowing that Cabrera had maintained his innocence, the prosecutor said,

whom the defense sought to impeach with purported *Brady* evidence was originally called by the defense did not affect the *Brady* analysis because by the time the defense sought the *Brady* information the witness had "flipped" and started testifying against the defendant).

**51.** *Cf. id.* at 893. The D.C. Circuit stated:

In the usual case there is a conceptual difference between the impeachment of a government witness and the impeachment of a defense witness. Evidence that impeaches the former is almost invariably "favorable" to the accused, because by making the government's case less credible it enhances the defendant's chances of acquittal. Evidence that impeaches a defense witness,

by contrast, is not generally favorable to the accused; by reducing the credibility of the defendant's own witness, such impeachment reduces the probability that he will obtain a not guilty verdict. It is ordinarily the prosecutor rather than defense counsel who wants to use the latter kind of evidence—although she may prefer to delay its use (and disclosure) until after the witness testifies, both to prevent tailoring of the testimony in expectation of the cross-examination and to employ the element of surprise to expose the witness' mendacity.

**52.** For example, these situations might occur, as in *Sealed Case No. 99–3096*, where a witness "flips" and ultimately provides testimony favorable to the party who did not call the witness.

The defendant spoke—I didn't notice how long—10, 15 minutes perhaps at the outside. He talked about [various things].... Of that ten or 15 minutes during which he spoke, ladies and gentlemen, he said one thing and one thing very briefly to those people he has harmed so greatly and to those people who have suffered so much pain at his hands, he said, "I want to extend my condolences to the family of Vaughn Rowe and Brandon Saunders."

The trial court overruled Cabrera's objection. The prosecutor again stated, "He took that moment to say that he expressed his condolences to the families of Vaughn Rowe and Brandon Saunders." Cabrera contends that the prosecutor's remarks violated Cabrera's right to a fair trial and his privilege against self-incrimination. We review for abuse of discretion the Superior Court's refusal to declare a mistrial based on an improper remark by the prosecutor.[53]

 The prosecutor's comments were not improper. Cabrera argues that they constituted improper comments on Cabrera's failure to express remorse. Prosecutorial comment on a defendant's failure to testify violates the defendant's Fifth Amendment protection against self-incrim-

ination.[54] In *Shelton v. State*, this Court considered whether a prosecutor's comment on the defendant's failure to show remorse during allocution constituted an improper comment on the defendant's failure to testify.[55] The Court adopted the test articulated in *Lesko v. Lehman*[56] for determining whether a prosecutor improperly commented on a defendant's right to remain silent. Under that test, a court should consider " 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' "[57] The Court in *Shelton* decided that the prosecutor's remarks were not improper because they reflected solely on the defendant's character, indicating that he was an unfeeling man, not that he failed to testify. They were brief and they directly related to the defendant's statement during allocution.[58]

The prosecutor's remarks in the present case similarly pertained directly to Cabrera's statement during allocution. The prosecutor essentially repeated verbatim what Cabrera had said during allocution. In *Shelton*, by contrast, the prosecutor specifically stated that the defendant had failed to show any remorse.[59] Given the

---

53. *See Diaz v. State*, 508 A.2d 861, 866–67 (Del.1986) (holding that the trial court did not abuse its discretion by denying a mistrial after the defendant challenged a prosecutorial remark during opening arguments as improper).

54. *See Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) ("[C]omment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege." (citation omitted) (footnote omitted)).

55. 744 A.2d 465, 500–04 (Del.2000).

56. 925 F.2d 1527, 1544 (3d Cir.1991).

57. *Shelton*, 744 A.2d at 502 (quoting *Lesko*, 925 F.2d at 1544).

58. *Id.* at 503.

59. *See id.* at 501 (quoting the prosecutor as saying, "[T]he importance of what you do and what this all means is the remorse that has been shown in the words of ... Steven Shelton in allocution. And [he] told you or paid lip service that [he] had concerns for the families of the victim, but what did you hear about [his] remorse for [his] acts? What did you hear about that concern for the families of the victim whose life was taken innocently ... ?").

limited and verbatim repetition of Cabrera's statements, a jury would not naturally or necessarily infer that the prosecutor was commenting on Cabrera's failure to testify. Moreover, here, as in *Shelton*, the prosecutor's comments, to the extent they touched on Cabrera's lack of remorse at all, did so very briefly. The prosecutor did not improperly comment on Cabrera's lack of remorse in violation of his privilege against self-incrimination.

### The Constitutionality of the 1991 Death Penalty Statute

 Cabrera contends that the United States Supreme Court decisions in *Apprendi v. New Jersey*,[60] *Ring v. Arizona*,[61] and *Caldwell v. Mississippi*[62] render unconstitutional the Delaware death penalty statute in effect when Cabrera was tried, convicted, and sentenced. He argues that the court informed the jury that it would function as an "advisory jury," i.e. that it was merely making a recommendation, and that the judge would make the final determination as to the existence of a statutory aggravating circumstance and whether a death sentence would be imposed. He contends that the jury was misled about its role because the jury was not informed that its verdict during the guilt phase would bind its finding of the existence of a statutory aggravating circumstance during the penalty phase. We review this claim for plain error because Cabrera did not raise it before the trial court.[63]

As noted by Cabrera, this Court has rejected this argument on the merits and has upheld the constitutionality of the 1991 version of the death penalty statute.[64] In *Swan v. State*,[65] this Court held that the 1991 statute was constitutional as applied to Swan. The Court began by noting that in *Brice* it had held that the Supreme Court's decision in *Ring*[66] requires a jury to find unanimously and beyond a reasonable doubt the existence of a statutory aggravating circumstance that renders a

---

**60.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

**61.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**62.** 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

**63.** *See* DEL. SUPR. CT. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented."); *Nieves v. State*, No. 352, 2003 WL 329589, at *1, 2003 Del. LEXIS 82, at *2 (Del. Feb. 11, 2003) (ORDER) (reviewing a constitutional claim for plain error because it was not raised at trial); *Bullock v. State*, 775 A.2d 1043, 1061 (Del.2001) ("[W]e have reserved the plain error standard to claims affecting substantial rights, i.e. of constitutional dimension, because only such claims can be said to jeopardize the fairness and integrity of the trial process." (internal quotation omitted)).

**64.** Title 11, Section 4209 of the Delaware Code was amended in 2002 to require the jury to find, unanimously and beyond a reasonable doubt, the existence of a statutory aggravating circumstance before the sentencing judge may consider imposing a death sentence. *See Brice v. State*, 815 A.2d 314, 322 (Del.2003) (reviewing the 2002 amendments to Section 4209 and upholding the statute's constitutionality). The 1991 version of Section 4209, the provision applied to Cabrera, required the jury to decide whether an aggravating circumstance existed, but did not mandate a unanimous finding on that issue. DEL. CODE ANN. tit. 11, § 4209(c)(3a) (2001).

**65.** 820 A.2d 342 (Del.2003).

**66.** In *Ring*, the U.S. Supreme Court held that "[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589, 122 S.Ct. 2428.

defendant "death eligible."[67] We held that the jury's *conviction* of Swan unanimously and beyond a reasonable doubt of felony murder under Title 11, Section 636(a)(6) of the Delaware Code satisfied *Ring* because a conviction under Section 636(a)(6) established the existence of a statutory aggravating circumstance under Section 4209. Similarly in *Cabrera's* case, the jury convicted Cabrera, unanimously and beyond a reasonable doubt, of the intentional murder of two people.[68] Because the jury had to find, unanimously and beyond a reasonable doubt, that Cabrera's conduct resulted in the deaths of two people and that the deaths were the probable consequence of his conduct in order to convict Cabrera of the charges against him, *Ring* is satisfied here as it was in *Swan.*

In *Reyes v. State,*[69] this Court also upheld the constitutionality of the 1991 version of the death penalty statute in the face of an argument that *Ring* rendered it unconstitutional. We said in that case:

> The record reflects that *Ring*'s constitutional requirement of such fact-finding by a jury is satisfied in Reyes' case. The jury convicted Reyes of, among other crimes, two counts of Murder in the First Degree under Section 636(a)(1). Multiple convictions under Section 636(a)(1), resulting from a single course of conduct, establish the existence of a statutory aggravator under Section 4209(e)(1)(k)....
>
> The jury's finding of the statutory aggravator described in 4209(e)(1)(k) complies with the holding in *Ring.* The

jury's verdict that Reyes was guilty of committing two counts of Murder in the First Degree during a single course of conduct established the existence of the statutory aggravating "narrowing" circumstance, which made Reyes "death eligible." Such a finding during the guilt phase of Reyes' trial was made by the jury unanimously and beyond a reasonable doubt. When the very nature of a jury's guilty verdict simultaneously establishes the statutory aggravating circumstance set forth under Section 4209(e)(1)(k), that jury verdict authorizes a maximum punishment of death in a manner that comports with the United States Supreme Court's holding in *Ring.* Therefore, we hold that the 1991 version of Section 4209, as applied to Reyes, is constitutional.[70]

Like Reyes, Cabrera was convicted of two counts of murder in the first degree under Section 636(a)(1). The 1991 version of Section 4209, as applied to Cabrera, is therefore constitutional under *Ring.*

To the extent that Cabrera's argument that the jury misapprehended its role in the punishment phase differs from his constitutional challenge to Section 4209, that argument is without merit. Cabrera does not point to any particular statement made to the jury, nor does he provide any factual basis for his claim that the jury was told that its role was less important than it was. We have reviewed the charge given to the jury during the penalty phase, and we find no error in the trial court's description of the jury's role. The court told the jury that

---

67. *Swan,* 820 A.2d at 359.

68. *See* DEL. CODE ANN. tit. 11, § 4209(e)(1)(k) (2001) (establishing as a statutory aggravating circumstance that "[t]he defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths

are a probable consequence of the defendant's conduct").

69. 819 A.2d 305, 316 (Del.2003). Reyes acted with Cabrera in killing Rowe and Saunders.

70. *Id.* at 316–17.

while the Court has the ultimate responsibility for imposing sentence on the defendant, your role as jurors in the sentencing procedure is, nevertheless, both vital and important. You will provide the Court, as the conscience of the community, with an advisory opinion on what the jury believes the evidence has shown with regard to the appropriate penalty in this case. Although the Court is not bound by your recommendation, your recommended answers to the questions provided will be given great weight by the Court in its final determination of the appropriate sentence.

This charge comported with Delaware's capital punishment scheme. The Delaware death penalty statute provides that the jury shall "deliberate and recommend to the Court" whether a statutory aggravating circumstance exists and whether the aggravating circumstances outweigh the mitigating circumstances.[71] The sentencing judge makes the ultimate decision whether the death penalty shall be imposed.[72] The court therefore did not incorrectly inform the jury of its role in Cabrera's sentencing. Rather, the jury charge comported with Delaware law.

### Proportionality Review

Title 11, Section 4209(g) of the Delaware Code requires this Court to review any death sentence to determine whether (1) the sentence was arbitrarily or capriciously imposed or recommended, (2) the sentence was disproportionate to the penalty recommended in similar cases, and (3) the evidence supports the finding of a statutory aggravating circumstance.[73]

■■■ The finding of a statutory aggravating circumstance was supported by the evidence. The jury convicted Cabrera, unanimously and beyond a reasonable doubt, of the first degree murder of two victims, which crime satisfies the aggravating circumstance described in Section 4209(e)(1)(k). Cabrera does not contend that his sentence was arbitrarily or capriciously recommended or imposed. He does contend that his sentence was not proportionate.

■■■ The sentence was not disproportionate. In considering the proportionality of the sentence, the Court "refers to the 'universe' of cases involving first degree murder charges that have included a penalty hearing and after the conclusion of which the sentence has become final."[74] It reviews "some objective factors, including the gravity of the offense, the circumstances surrounding the crime, and the harshness of the penalty" in order to determine "whether or not this case fits within a pattern of Delaware death sentence precedent."[75]

The proportionality review performed by this Court in *Reyes* supports the proportionality of Cabrera's sentence. In *Reyes* the Court found:

Reyes, like several other defendants sentenced to death in Delaware, was found guilty of killing multiple victims. Reyes, like others sentenced to death in

---

71. DEL. CODE ANN. tit. 11, § 4209(c)(3a).

72. *Id.* § 4209(d); *see also Brice v. State*, 815 A.2d 314, 322 (Del.2003) ("[T]he sentencing judge retains exclusive responsibility for weighing the aggravating and mitigating factors, and for the ultimate sentencing decision.").

73. DEL. CODE ANN. tit. 11, § 4209(g)(2); *see also Zebroski v. State*, 715 A.2d 75, 82 (Del.1998) (describing the statutorily prescribed review of death sentences by the Court).

74. *Zebroski*, 715 A.2d at 84.

75. *Id.*

Delaware, was found guilty of Murder in the First Degree of two defenseless individuals that were killed in a cold-blooded execution style murder. Therefore, Reyes' case is substantially similar to other Delaware cases where the death penalty was imposed. Accordingly, we conclude that Reyes' death sentence is proportionate.[76]

Here the jury by a vote of eleven to one recommended the death penalty by finding that the aggravating circumstances outweighed the mitigating circumstances. The sentencing judge agreed. As in *Reyes,* Cabrera's death sentence for a cold-blooded, execution-style murder of two victims is proportionate to other cases in which the death penalty was imposed.[77]

Cabrera's sentence is proportionate to cases in which defendants had significant histories of violent criminal conduct. In *Clark v. State,* this Court distinguished a case in which the defendant had received a life sentence on the basis that the defendant in that case had not shared Clark's "long history of violent criminal behavior."[78] In *Ferguson v. State,* this Court upheld a death sentence where the defendant had been previously convicted of a violent felony.[79] Cabrera was convicted in 1998 for the 1995 murder of a sixty-five-year-old man. Thus, Cabrera's history of

violent crime supports the conclusion that his sentence was proportionate.

Cabrera attempts to distinguish several cases in an effort to demonstrate that his sentence was disproportionate. Cabrera argues that in both *Weeks v. State*[80] and *Clark*[81] the trial court found that three statutory aggravating circumstances existed, while in this case the jury found only one statutory aggravating circumstance. The number of statutory aggravating circumstances found is not controlling, however. The statute requires only one statutory aggravating circumstance for imposition of the death penalty. A death sentence has been imposed in numerous cases where only one statutory aggravator was found.[82] In addition, the jury found several nonstatutory aggravating circumstances against Cabrera. *Weeks* and *Clark* do not establish that Cabrera's death sentence was disproportionate.

Cabrera argues that *State v. Cohen* also demonstrates the disproportionality of Cabrera's death sentence. In *Cohen,* the defendant murdered his parents.[83] He then evaded prosecution for a year, during which he committed another murder and other felonies.[84] He was finally arrested and pleaded guilty but mentally ill to his parents' murders.[85] At the penalty phase, the jury voted eight to four that the aggra-

---

76. *Reyes v. State,* 819 A.2d 305, 318 (Del. 2003) (footnote omitted).

77. *See also, e.g., Capano v. State,* 781 A.2d 556, 677 (Del.2001) (upholding a death sentence where the defendant was found guilty of the "unprovoked, cold-blooded murder of a defenseless person").

78. 672 A.2d 1004, 1010 (Del.1996).

79. 642 A.2d 772, 789 (Del.1994).

80. 653 A.2d 266, 271 (Del.1995).

81. 672 A.2d at 1008.

82. *E.g., Swan v. State,* 820 A.2d 342, 360 (Del.2003); *Reyes v. State,* 819 A.2d 305, 317 (Del.2003); *Zebroski v. State,* 715 A.2d 75, 83 (Del.1998); *Jackson v. State,* 684 A.2d 745, 754 (Del.1996).

83. Sentencing Decision, *State v. Cohen,* C.A. Nos. IN–90–02–0474 through IN–90–02–0477, at 2 (Del.Super.Ct. May 4, 1992).

84. *Id.*

85. *Id.* at 1.

vating circumstances did not outweigh the mitigating circumstances.[86]

*Cohen* is distinguishable from the present case on several grounds. First, the fact that Cohen pleaded guilty but mentally ill may have affected the penalty imposed, as mental illness is, as a matter of law, a mitigating circumstance.[87] Cabrera was not found to be mentally ill. Second, Cohen had no prior criminal record or convictions as an adult.[88] Cabrera had been convicted of forgery, attempted theft, criminal impersonation, and third-degree assault before the murders.[89] Third, and perhaps most significant, four *Cohen* jurors believed that the aggravating circumstances outweighed the mitigating circumstances, whereas eleven of Cabrera's jurors believed that the aggravators outweighed the mitigators. In any event, the Court need not find that the death sentence is perfectly symmetrical with those imposed in all other cases within the relevant universe of cases. It need only determine that the sentence does not markedly diverge from the norm and discern a principled basis for a difference in the sentences.[90] Cabrera's sentence was not disproportionate to the sentences imposed in other first-degree murder cases in Delaware.

### Conclusion

Accordingly, we AFFIRM the judgment of the Superior Court.

---

**86.** *Id.* at 4.

**87.** *Id.* at 1; *see also Sanders v. State*, 585 A.2d 117, 133 (Del.1990) ("At a minimum, a finding of guilty but mentally ill established a level of mitigation which the jury must take into consideration in fixing punishment.").

**88.** *Id.* at 12. Sentencing Decision, *State v. Cohen*, C.A. Nos. IN–90–02–0474 through IN–90–02–0477, at 12.

**89.** Sentencing Decision, *State v. Cabrera*, C.A. Nos. IN–99–04–0314 through IN–99–04–0319, at 31–32 (Del.Super.Ct. Mar. 14, 2002).

**90.** *See Flamer v. State*, 490 A.2d 104, 144 (Del.1983) (distinguishing cases in which life sentences were given because of some discernible basis for the different sentences); *see also Zebroski*, 715 A.2d at 84 (same).