IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JASON WHITE, | § | No. 328, 2020 |
| | § | |
| Defendant Below, | § | Court Below – Superior Court |
| Appellant, | § | of the State of Delaware |
| v. | § | |
| | § | I.D. No. 1808010617 (N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted:    June 9, 2021
Decided:    August 6, 2021

Before **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

John S. Malik, Esquire (argued), Wilmington, Delaware; *for Appellant Jason White.*

Matthew C. Bloom, Esquire (argued), DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; *for State of Delaware.*

1

**MONTGOMERY-REEVES**, Justice:

In 2019, Jason White was convicted of eight crimes related to possessing and dealing narcotics. White has filed a timely direct appeal, arguing that the Superior Court abused its discretion by allowing the State to admit text messages without proper authentication and that the prosecutor made improper comments during his rebuttal summation by misstating the burden of proof, denigrating the role of defense counsel, and vouching for evidence.

Having reviewed the parties' briefs and record on appeal, and after oral argument, this Court affirms the Superior Court's judgment. The State provided sufficient evidence to authenticate the text messages, and the prosecutor did not make improper remarks warranting reversal during his rebuttal summation.

## I.     RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.     The Police Arrest White and Recover Evidence of Drug Possession and Drug Dealing

On August 16, 2018, the New Castle County Police Department (the "NCCPD") executed a warrant to search a residence located on Cross Avenue in New Castle, Delaware (the "Cross Avenue Residence").[1] The NCCPD obtained the search warrant as part of an investigation into suspected narcotics dealing.[2]

---

[1] App. to Opening Br. 20-21, at 39:12-42:11 (hereinafter, "A_").
[2] A20, at 39:15-40:2.

The primary breaching officer knocked on the front door, announced the presence of police, waited a few moments, and then broke down the door and entered the residence.[3]  At about the same time, another officer broke through a bathroom window and moved the curtains to observe the bathroom and ensure that no evidence was flushed down the drain.[4]  That officer saw the Appellant, Jason White, attempting to enter the bathroom.[5]  After noticing the officer, White ignored orders to stop and retreated back into the residence.[6]

Inside, the officers who entered the Cross Avenue Residence through the front door encountered two adults, a child, and two dogs.[7]  The officers allowed one of the adults to place the dogs in cages.[8]  After the dogs were secured, the officers noticed a third adult—White—standing in a hallway towards the back of the residence.[9]  White appeared to bend down, pick something up, and throw the object into a bedroom located in the back-right corner of the residence.[10]  Afterwards, White moved into the back-right bedroom, disappearing from the officers' fields of view.[11]  The officers repeatedly ordered White to put

---

[3] A40, at 120:10-23.
[4] *See id.*
[5] A41, at 121:10-122:8.
[6] *Id.* at 122:18-19.
[7] A45, at 5:12-18.
[8] *Id.* at 6:6-13.
[9] *Id.* at 7:5-14.  While sweeping the Cross Avenue Residence officers found one more adult and two more children, meaning that a total of seven people—four adults and three children—were present at the time of the search.  A22, at 47:6-15.
[10] A45, at 7:5-11.
[11] *Id.* at 7:11-14.

his hands up and exit the bedroom.[12] White did not comply immediately, but returned to the hallway after a few seconds and surrendered.[13]

After securing the scene, the officers searched the Cross Avenue Residence for evidence of narcotics dealing.[14] The residence contained three bedrooms, an addition being used as a sleeping area, a living room, and a bathroom.[15] In the living room, the officers found a digital scale and a glass smoking pipe.[16] In White's bedroom, the officers found a small amount of marijuana, boxes of empty plastic baggies, cut straws, and a smoking pipe.[17] The officers also found three cellphones in White's bedroom manufactured, respectively, by Alcatel, Coolpad, and ZTE.[18]

In the back-right bedroom, which belonged to a woman who was not home during the search, officers found a substantial quantity of narcotics, including more than a dozen bags of heroin;[19] more than three dozen pills that appeared to be oxycodone;[20] and methamphetamine that had been spilled onto the carpet.[21] Subsequent lab tests confirmed the presence of more than twelve grams of a heroin-fentanyl mixture;[22] more than thirty-

---

[12] *Id.*
[13] *Id.*
[14] *See* A22, at 48:4-14.
[15] *Id.* at 45:17-46:7; A30, at 79:6-13.
[16] A28, at 69:18-70:4.
[17] A23, at 51:2-52:5.
[18] A62, at 73:20-76:9.
[19] A61, at 71:2-23; A30, at 77:16-20; A27, at 67:7-13.
[20] A25, at 60:12-16.
[21] A26, at 61:11-62:19.
[22] A57, at 55:4-19.

eight grams of a methamphetamine-fentanyl mixture;[23] and numerous fentanyl pills.[24] The officers did not find evidence of note in the other parts of the residence.

At the scene, the chief investigating officer asked White about the narcotics recovered from the back-right bedroom.[25] White denied any knowledge but asked for an ambulance to clean his hands because "he believed" that they were "contaminated" with something and he "didn't want it to spread."[26] The officers arrested White and took him to NCCPD headquarters, where he agreed to a second interview.[27] During the second interview, White admitted to selling heroin and methamphetamine and claimed that all of the narcotics found at the Cross Avenue Residence belonged to him.[28]

### B. The Jury Convicts White of Drug-Possession and Drug-Dealing Offenses

A Grand Jury charged White with eight counts related to drug dealing and possession: three counts of felony Drug Dealing; two counts of felony Aggravated Possession of drugs; and three misdemeanor counts of Endangering the Welfare of a Child.[29] At trial, the State offered testimony from the chief investigating officer, another officer who participated in the August 16 raid, a lab technician who provided expert testimony about the evidence recovered from the Cross Avenue Residence, and an NCCPD detective who provided expert

---

[23] A58, at 57:8-15.
[24] *See* A59-60, at 63:12-65:18.
[25] A28, at 70:11-19.
[26] *Id.* at 70:20-71:9.
[27] A64, at 83:1-9.
[28] A74, at 121:6-10; A88, at 15:13-16.
[29] A7-10.

testimony on the narcotics trade.[30] Among other things, the witnesses recounted incriminating information linking White to the narcotics found at the Cross Avenue Residence,[31] and White's confession to possessing and dealing narcotics.[32]

In addition to this testimony, the State introduced text messages downloaded from the ZTE cellphone found in White's bedroom.[33] The text messages appeared to show the phone's user arranging narcotics transactions.[34] The State claimed that the phone belonged to White because it was found in his bedroom;[35] and because it contained a message from a contact named "Cass" informing the user, "[T]old the lady down the block ya name Jason White."[36] A little more than a day later, the phone's user appears to have responded with "okay."[37] The State offered testimony at trial that White's significant other was named "Cassie," and there were numerous text messages between the phone's user and "Cass" suggesting that they were in an intimate relationship.[38] The NCCPD did not seek the phone's

---

[30] *See* A11-105.

[31] *See, e.g.*, A51-61 (testimony from a lab technician confirming that the NCCPD recovered narcotics from the Cross Avenue Residence); A90-96 (expert testimony that the physical evidence recovered from the Cross Avenue Residence was consistent with drug dealing).

[32] A74, at 121:6-10; A88, at 15:13-16.

[33] A62, at 73:20-76:21.

[34] *See, e.g.*, A70, at 105:19-106:4.

[35] *See* A62, at 73:30-76:9.

[36] A63, at 78:12-79:3.

[37] *Id.* at 78:9-13.

[38] A63, at 77:8-12; A69, at 104:20-22.

subscriber information,[39] and the phone's operating system identified its primary user with the apparent pseudonym "Joe Schmoe."[40]

The State also offered wiretap recordings from a separate investigation that may have captured White making incriminating statements,[41] including a conversation in which White purportedly admitted that he tried to hide and destroy evidence of narcotics dealing during the August 16 raid.[42] The Superior Court raised some doubt about whether this recording was sufficiently audible to understand what was said, but the recording was played for the jury and admitted into evidence.[43]

White chose to rest on the State's case and did not provide a separate presentation of evidence.[44] The jury convicted White on all counts,[45] and the Superior Court imposed sentences that were within the applicable sentencing guidelines.[46]

## II.  ANALYSIS

White has filed a timely direct appeal raising two issues. First, whether the Superior Court abused its discretion by allowing the State to admit text messages downloaded from

---

[39] *See, e.g.*, A69, at 103:1-6.

[40] *See, e.g.*, *id.*, at 102:9-20.

[41] *See* A77-79, at 136:21-144:5.

[42] A79, at 143:4-23.

[43] *See* A81, at 152:1-7 ("THE COURT: Well, you're saying [that an NCCPD officer] [is] familiar with [White's] voice. Other than [the officer] saying that, how is he familiar? . . . I'll be candid with you. If you think anybody in this courtroom heard anything that was said on this tape, I assure you they didn't because it was almost inaudible.").

[44] A113, at 114:1-4.

[45] *See* A4.

[46] *See* A165-71.

the ZTE cellphone found in White's bedroom without properly authenticating the messages.[47]  Second, whether the prosecutor made improper remarks during his rebuttal summation by misstating the burden of proof and vouching for evidence.[48]  This Opinion addresses each issue below.

### A.  The State Offered Sufficient Evidence to Authenticate the Text Messages Downloaded from the ZTE Cellphone

The first issue on appeal is whether the Superior Court abused its discretion by allowing the State to admit text messages downloaded from the ZTE cellphone without properly authenticating that White wrote the messages.[49]  White's main objection is that the State did not offer a witness with first-hand knowledge to authenticate the text messages.[50]  Rather, the State relied on the chief investigating officer to authenticate and introduce the messages.[51]  The chief investigating officer did not personally recover the cellphone from White's bedroom and relied on a different officer with technical expertise to extract the text messages from the cellphone.[52]  White also objects that the State neither sought nor offered the cellphone's subscriber information.[53]

---

[47] Opening Br. 14-20.
[48] *Id.* at 21-29.
[49] *Id.* at 14-20.
[50] *Id.* at 16-19.
[51] A62-63, at 73:20-79:9; A68-70, at 98:17-107:2; A73, at 117:12-119:22.
[52] A31, at 81:20-84:2; A70, at 106:10-19.
[53] Opening Br. 19; *see, e.g.*, A69, at 102:21-103:6.

"This Court . . . reviews for abuse of discretion a trial court's decision that evidence has been properly authenticated."[54] "An abuse of discretion occurs when a court has . . . exceeded the bounds of reason in view of the circumstances, [or] . . . so ignored recognized rules of law or practice . . . to produce injustice."[55]

Under Rule 901(a) of the Delaware Uniform Rules of Evidence, "the proponent" of "an item of evidence . . . must produce evidence sufficient to support a finding that the item is what the proponent claims it is." To satisfy the authentication requirement, the State need only "establish a rational basis from which the jury could conclude that the evidence is connected with the defendant."[56] The link between the defendant and the evidence "need not be conclusive," and "[a]n inconclusive link diminishes the weight of the evidence but does not render it inadmissible."[57] "[T]here are no hard-and-fast rules about how" the State must meet the authentication requirement,[58] and it is permissible to use the content and context of a text message for authentication.[59]

This Court holds that the Superior Court did not abuse its discretion by concluding that the State provided enough evidence to authenticate the text messages downloaded from

---

[54] *Cabrera v. State*, 840 A.2d 1256, 1263 (Del. 2004) (citing *Taylor v. State*, 777 A.2d 759, 771 (Del. 2001)).

[55] *Parker v. State*, 85 A.3d 682, 684 (Del. 2014) (alteration in original) (citing *Culp v. State*, 766 A.2d 486, 489 (Del. 2001)).

[56] *Cabrera*, 840 A.2d at 1265 (citing *Williams v. State*, 568 A.2d 1073, 1989 WL 154710, at *1 (Del. Dec. 4, 1989) (TABLE)).

[57] *Id.* (citing *Ward v. State*, 575 A.2d 1156, 1160 (Del. 1990)).

[58] *Schaffer v. State*, 184 A.3d 841, 2018 WL 1747793, at *5 (Del. Apr. 10, 2018) (TABLE).

[59] *See, e.g.*, *Moss v. State*, 166 A.3d 937, 2017 WL 2806269, at *3 (Del. June 28, 2017) (TABLE).

9

the ZTE cellphone. It is unclear why the State failed to present subscriber information, which the State admitted during oral argument should have been easy to obtain.[60] Regardless, the authentication requirement imposes a "lenient burden" that is "easily met,"[61] and the State did not need to retrieve the cellphone's subscriber information to clear the low bar for authentication based on the facts of this case. The ZTE cellphone was recovered from White's bedroom,[62] and White has not presented any evidence that the room was occupied by another person. The cellphone contained numerous messages from White's significant other, Cassie.[63] Among these messages was a message from Cassie informing the cellphone's user that Cassie "told the lady down the block *ya name Jason White*."[64] And the cellphone's user appears to have responded with "okay."[65]

Finally, the chief investigating officer was present when the ZTE cellphone was recovered from White's bedroom,[66] supervised the search,[67] and was able to testify about how a technician generated reports of the text messages downloaded from the cellphone.[68] It was not an abuse of discretion to conclude that the totality of this circumstantial evidence

---

[60] Oral Argument at 27:20-28:06 (June 9, 2021) (obtaining subscriber information "is a fairly straightforward process . . . that is well-worn," though it depends upon the responsiveness of the cellphone provider), https://livestream.com/accounts/5969852/events/9697318/videos/222111730.

[61] *Guy v. State*, 913 A.2d 558, 564 (Del. 2006) (quoting *Whitfield v. State*, 524 A.2d 13, 16 (Del. 1987)); *Cabrera*, 840 A.2d at 1264-65 (citing *Whitfield*, 524 A.2d at 16).

[62] A62, at 73:20-76:9.

[63] A63, at 77:8-12; A69, at 104:20-22.

[64] A63,at 78:12-79:3 (emphasis added).

[65] *Id.* at 78:9-13.

[66] *See, e.g.*, A23, at 51:14-21; A28, at 71:10-16; A68, at 98:7-99:1.

[67] *See, e.g.*, A31, at 83:17-84:12.

[68] *See, e.g.*, A62-63, at 73:20-77:15.

supplied a rational basis to infer that the ZTE cellphone belonged to White, and that White authored the text messages downloaded from the cellphone. Thus, the Superior Court did not abuse its discretion by allowing the State to admit the text messages downloaded from the ZTE cellphone, and the concerns White has raised go to the weight of the evidence rather than its admissibility.

**B.      The Prosecutor Did Not Make Improper Remarks Warranting Reversal**

The second issue on appeal is whether the prosecutor made improper comments during his rebuttal summation by misstating the burden of proof, denigrating the role of defense counsel, and improperly vouching for evidence.[69] We apply the plain error standard of review because defense counsel did not object to the prosecutor's remarks during trial.[70] The first step in our analysis, however, is to review the record *de novo* to determine whether the prosecutor made improper comments.[71] "If we determine that no misconduct occurred, our analysis ends."[72] If, however the prosecutor made improper comments we apply the *Wainwright* standard, under which "the error complained of must be so clearly prejudicial to

---

[69] Opening Br. 21-29.

[70] *See, e.g.*, *Czech v. State*, 945 A.2d 1088, 1097 (Del. 2008) ("Failure to raise a contemporaneous objection to allegedly prejudicial testimony constitutes a waiver of that issue on appeal unless the error is plain." (citing *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986))); *Baker v. State*, 906 A.2d 139, 148 (Del. 2006) ("[O]ur standards for reviewing prosecutorial misconduct are slightly different depending on whether the issue was fairly presented below. . . If defense counsel failed [to object during trial] and the trial judge did not intervene *sua sponte*, we review only for plain error." (citing *Kurzman v. State*, 903 A.2d 702, 708-09 (Del. 2006))).

[71] *Baker*, 906 A.2d at 150.

[72] *Id.*

substantial rights as to jeopardize the fairness and integrity of the trial process."[73] This review "is limited to material defects which are apparent on the face of the record; which are basic, serious, and fundamental in their character; and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[74]

### 1. The prosecutor did not attempt to shift the burden of proof or denigrate the role of defense counsel

Defense counsel devoted much of his closing remarks to pointing out purported examples of reasonable doubt with the State's case against White, such as whether the narcotics found in the back-right bedroom belonged to White,[75] whether the ZTE cellphone belonged to White,[76] and whether the evidence recovered from White's bedroom was consistent with drug dealing.[77] The prosecutor responded to these arguments by reminding the jury of various pieces of evidence that allegedly proved that White possessed and dealt narcotics at the Cross Avenue Residence.[78] In making this argument, the prosecutor told the jury that defense counsel, "in doing his job for the defendant, trie[d] to raise as much reasonable doubt as he can."[79] Elsewhere, the prosecutor transitioned between two topics by stating, "One of the ways [defense counsel] attempted to raise issues with reasonable

---

[73] *Id.* (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).
[74] *Id.* (formatting altered) (quoting *Wainwright*, 504 A.2d at 1100).
[75] *See* A120, at 142:3-143:13.
[76] *See* A120-21, at 144:3-147:12.
[77] *See, e.g.*, A119, at 138:10-17.
[78] *See* A123-25, at 153:9-162:14.
[79] A124, at 157:7-8.

doubt [was] based on the defendant's own statement . . . where [White] admitted [that] he ha[d] crystal meth[amphetamine], [] [that] he sells heroin, and [that] he was doing it out of [the Cross Avenue Residence]."[80]

White argues that these remarks "misstated the law as to the burden of proof and confused the jury" by suggesting that a criminal defendant has the burden of proving a reasonable doubt to avoid conviction.[81] Further, White argues that these remarks improperly "denigrate[d]" defense counsel's role by suggesting to the jury that defense counsel was trying to trick the jury into finding White not guilty.[82]

"In a criminal case, it is the State's burden to prove to the jury's satisfaction that there is no reasonable doubt that the defendant committed the crime." [83] "The defendant has a constitutional right to not testify and is under no burden to introduce evidence of [their] lack of guilt."[84] It is "entirely improper" for a prosecutor to "suggest" to the jury in closing remarks "that the reasonable doubt standard . . . should be viewed with suspicion."[85] Similarly, it is improper for a prosecutor to "denigrate the role of defense counsel," such as

---

[80] *Id.* at 159:22-160:3.
[81] Opening Br. 25.
[82] *See id.* at 27-28.
[83] *See, e.g.*, *Crosby v. State*, 108 A.3d 291, 293 (Del. 2015) (citing *In re Winship*, 397 U.S. 358, 364 (1970)).
[84] *Id.* (citing *Griffin v. California*, 380 U.S. 609 (1965)) (other citation omitted).
[85] *Hunter v. State*, 815 A.2d 730, 736 (Del. 2002).

"by saying that defense counsel's job [is] to *trick* the jury into letting [the defendant] go free."[86]

A prosecutor's comment on defense counsel's presentation, however, does not provide automatic grounds for reversal. For example, in *Derose v. State*, the prosecutor responded to defense counsel's suggestion that a doctor's diagnosis was influenced by knowledge obtained before viewing the patient by stating that the diagnosis "wasn't planted [in the doctor's] mind *despite what the defense may have you believe*."[87] The Court held that this comment did not denigrate defense counsel because "[s]uggesting that the inference that the defense would have the jury draw would be incorrect does not amount to an accusation that the defense tried to 'fool' a jury. To rule otherwise, would be tantamount to pulling the adversarial teeth from an effective prosecutor's mouth in summation."[88] Similarly, in *Coverdale v. State*, the Court held that the prosecutor's characterization of defense counsel's argument as a "red herring" did not warrant reversal because it was a one-off remark, supported by the record, that had "no effect on [the defendant's] right to a fair trial."[89]

---

[86] *Id.* (emphasis added); *see also Walker v. State*, 790 A.2d 1214, 1220 (Del. 2002) ("Arguments by the prosecutor to the jury . . . should focus on *evidence* introduced at trial rather than on his or her opinion of defense counsel's personality or trial strategy. It is impermissible for a prosecutor to discredit defense counsel in front of the jury." (first citing ABA STANDARDS FOR CRIM. JUST. § 4-7.8(a) (AM. BAR ASS'N 1980); then citing Del. Laws.' R. of Pro. Conduct 3.4; and then citing *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987), *overruled on other grounds* 775 Fed. App'x 423 (11th Cir. 2019))).

[87] 840 A.2d 615, 622-23 (Del. 2003) (emphasis added).

[88] *Id.*

[89] 844 A.2d 979, 981 (Del. 2004).

The Court understands White's concern that the prosecutor's inartful statements *could* have been construed to misstate the burden of proof in a criminal case. The context makes clear, however, that the prosecutor was simply describing defense counsel's closing argument and explaining how that argument was inconsistent with the evidence the State offered against White. Defense counsel referred to examples of "reasonable doubt" several times during his closing remarks.[90] The prosecutor made his objectionable comments in the context of reminding the jury of the evidence that allegedly proved White's guilt beyond a reasonable doubt.[91] In making that rebuttal argument, the prosecutor repeatedly told the jury that *the State* had the burden of proving White's guilt beyond a reasonable doubt.[92] And the Superior Court instructed the jury that it was the State's burden to prove that White committed each element of each crime with which he was charged beyond a reasonable doubt.[93] Finally, the record does not show that the prosecutor made any effort to denigrate defense counsel or suggest that defense counsel was relying on frivolous arguments to deceive the jury. Accordingly, this Court holds that the prosecutor did not make improper

---

[90] *See, e.g.*, A118, at 133:17-20 ("So what I'd like to do is go through some of the facts of this case with respect to the charges and suggest to you where there may be some room for reasonable doubt in this case.").

[91] *See* A123-25, at 153:9-162:14.

[92] *See, e.g.*, A123-24, at 156:23-157:2 ("Instead, we presented evidence that. . . proves the defendant's guilt beyond a reasonable doubt."); A125, at 162:6-14 ("Ladies and gentleman, the State submits that the evidence you saw is overwhelming . . . and the State has met *its burden* beyond a reasonable doubt to show that the defendant" is guilty. (emphasis added)).

[93] *See, e.g.*, A127, at 172:1-21.

comments by attempting to shift the burden of proof to the defendant or by casting aspersions on the role of defense counsel.

### 2. The prosecutor did not improperly vouch for the strength of the State's case

During closing remarks, defense counsel argued that the State did not prove beyond a reasonable doubt that all of the narcotics recovered from the Cross Avenue Residence belonged to White.[94] The prosecutor responded to this argument during his rebuttal summation by reminding the jury of various pieces of evidence that linked White to the narcotics, including a wiretap recording in which White purportedly admitted that he attempted to dump narcotics in other parts of the residence to avoid criminal liability. When transitioning from quoting this recording to another piece of evidence, the prosecutor told the jury "*I think* that there pretty much explains" how the narcotics ended up in the back-right bedroom:

> There are a couple of issues and a couple of points [defense counsel] made [that] the State didn't necessarily agree with.
>
> First of all, . . . [one of the detectives] testified [that] he identified the defendant running into the bathroom, the opening of the bathroom door, and when they ID'd him, Jason, stop, come back, he didn't comply. He ran back out of there.
>
> They will connect that with a cell phone conversation that was intercepted between [a third-party] and Jason White. ["]Yeah, they trashed out the shit though. They got rid of most of the shit. I mean, I was running around getting rid of the shit when they hit the [residence]. I tried going to the bathroom and

---

[94] *See, e.g.*, A118-20, at 136:18-142:22.

shit, but they blew the . . . windows out and as soon as I walked in . . . I turned around and . . . just started dumping the shit. Went everywhere.["]

*I think that there pretty much explains where the stuff went*, because [the back-right] bedroom, there's stuff everywhere. There's literally bags in multiple different locations with a bag of Crystal meth strewn all over the floor.[95]

White argues that the prosecutor's use of the first-person pronoun "I" was improper because it offered the prosecutor's personal view of the evidence.[96] White adds that "[t]he prosecutor's remark was especially harmful because he improperly [commented] on a piece of evidence, the wiretap calls, which were of poor audio quality."[97]

The Court has recognized that it is inappropriate for prosecutors to offer their personal opinions of the evidence or the defendant's guilt during a closing argument.[98] "This condemnation flows from the possibility that the authority and respect the office of the prosecutor commands may 'induce the jury to trust the Government's judgment rather than [the jury's] own view of the evidence.'"[99] To combat this concern, prosecutors "ha[ve] a duty to take care that the argument the State presents to the jury stands or falls on its own

---

[95] A123-24, at 153:18-157:6. It is unclear whether the prosecutor's quotation of the recording was verbatim. White does not argue that the prosecutor made any errors transcribing the recording, *see* Opening Br. 23-25, though he characterizes the prosecutor's comments as offering a personal interpretation of what was said rather than a quotation, Reply Br. 6-8.

[96] Opening Br. 22-24.

[97] *Id.* at 24.

[98] *See, e.g.*, *Trala v. State*, 244 A.3d 989, 999-1000 (Del. 2020); *Brokenbrough v. State*, 522 A.2d 851, 858-59 (Del. 1987).

[99] *Trala*, 244 A.3d at 1000 (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)) (citing *Rasin v. State*, 187 A.3d 1209, 2018 WL 2355941, at *2 (Del. May 23, 2018) (TABLE)).

17

merit, rather than relying, even unintentionally, on the respect and deference to which the public gives the prosecutor's office."[100]

"In a closing argument, the use of the word 'I' only serves to emphasize for the jury that the prosecutor . . . personally believes the point that is being submitted to the jury for consideration. . . . This type of argument is contrary to the ABA standards and the Delaware Rules of Professional Responsibility."[101] Nonetheless, while a prosecutor's "use of the word 'I' is often problematic,"[102] "there is no *per se* rule forbidding it."[103] Instead, the Court must consider "the context in which the statements were made" to determine whether the prosecutor improperly vouched for the State's case against the defendant and, if so, whether such comments require reversal.[104] "The Court will not find a plain error" where the prosecutor "suggest[ed] a logical inference from the evidence presented at trial" and did not imply "awareness of other information outside the record."[105]

This issue presents a closer call. It was inappropriate for the prosecutor to use the first-person pronoun "I" when describing the evidence. Such statements are inherently

---

[100] *Id.*

[101] *Brokenbrough*, 522 A.2d at 859 ; *see, e.g.*, Del. Laws.' Rules of Pro. Conduct 3.4(e) (prohibiting lawyers from stating "a personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused . . . .").

[102] *Trala*, 244 A.3d at 999 (first citing *Derose v. State*, 840 A.2d 615, 621 (Del. 2003); and then citing *Moreta v. State*, 210 A.3d 142 (Del. 2019)).

[103] *Id.* (citing *Swan v. State*, 820 A.2d 342, 356 n.35 (Del. 2003)).

[104] *Id.*

[105] *Id.* (citation omitted) (citing *Booze v. State*, 919 A.2d 561, 2007 WL 445969, at *4 (Del. Feb. 13, 2007) (TABLE)).

18

suspect because they can suggest that the State is throwing its power and special access to information behind its view of the evidence.[106] Nonetheless, the context shows that the prosecutor's statement was an inartful attempt to transition between discussing two pieces of evidence, not an effort to vouch for the content of the wiretap recording. And on appeal, White does not challenge the Superior Court's decision to admit the wiretap recording or object to the prosecutor's transcription of what was said on the recording.[107] Accordingly, the Court holds that the prosecutor's use of the first-person pronoun "I" was not an attempt to express a personal opinion about a piece of evidence that "jeopardized the fairness and integrity" of White's trial.[108]

## III. CONCLUSION

For the reasons provided above, the judgment of the Superior Court is affirmed.

---

[106] *See, e.g.*, *id.* at 999-1000.
[107] *See* Opening Br. 21-29.
[108] *Baker*, 906 A.2d at 150 (quoting *Wainwright*, 504 A.2d at 1100).