IN THE SUPREME COURT OF THE STATE OF DELAWARE

CAMERON PIERCE,                      §
                                     §    No. 417, 2020
                                     §
    Defendant Below,                 §
    Appellant,                       §
                                     §
                                     §    Court Below:  Superior Court
    v.                               §    of the State of Delaware
                                     §
                                     §
STATE OF DELAWARE,                   §
                                     §    C.A. No. 1810017344(N)
                                     §
    Plaintiff Below,                 §
    Appellee.                        §


                    Submitted:    November 3, 2021
                    Decided:      January 4, 2022


Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Elliott Margules, Esquire, Office of Defense Services, Wilmington, Delaware for Appellant.

Andrew J. Vella, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

*Introduction*

Following a three-day bench trial, the Superior Court convicted defendant-appellant Cameron Pierce ("Pierce") of two counts of Robbery First Degree, two counts of Wearing a Disguise During the Commission of a Felony, and two counts of Felony Theft. The Superior Court sentenced Pierce to a total of 60 years at Level 5 incarceration, suspended after 6 years, to be followed by probation.[1]

Pierce appeals his conviction, asserting that (i) the Superior Court erred in admitting palmprint evidence because it lacked the requisite foundation for admission, and (ii) the Superior Court's verdict was not supported by evidence sufficient to identify Pierce as the suspect who robbed Silverside Discount Liquors.

We find no merit in either of Pierce's claims of error. Accordingly, we AFFIRM the judgment of conviction.

## I. Relevant Facts and Procedural Background

### A. The First Robbery

On July 26, 2018, at approximately 9:30 p.m., an armed robber entered and robbed Silverside Discount Liquors in Wilmington, Delaware (the "First Robbery"). Anesh Kalyanapu ("Kalyanapu"), Silverside Discount Liquors' manager, complied with the armed robber's demands, the armed robber exited, and Kalyanapu then called 911.

---

[1] Opening Br., Ex. C (Sentence Order). At the time of sentencing in this matter, Pierce was also sentenced for one count of Escape after Conviction and one count of Resisting Arrest and received an additional year of unsuspended Level V time which was not the subject of this appeal.

Thereafter, Detective Anthony Tenebruso ("Detective Tenebruso"), a member of the Delaware State Police (Troop 2) Criminal Investigations Unit, was called to the scene. Detective Tenebruso called the State's Evidence Detection Unit after he viewed Silverside Discount Liquors' surveillance system and observed that the armed robber had not worn gloves during the robbery.[2]

Detective Timothy Harach ("Detective Harach"), an evidence detective with the State's Evidence Detection Unit, attempted to collect fingerprint evidence using latent fingerprint dust. However, he was unsuccessful.

B. *The Second Robbery*

On August 16, 2018, Kalyanapu again worked the closing shift at Silverside Discount Liquors. At approximately 7:30 p.m., an armed robber entered and robbed the store (the "Second Robbery"). After Kalyanapu complied with the armed robber's demands, the armed robber fled, and Kalyanapu called 911.

Detective Brian McDerby from the Criminal Investigative Unit of the Delaware State Police (Troop 2) ("Detective McDerby") responded to Silverside Discount Liquors. There he reviewed the surveillance video and observed that the armed robber had not worn gloves. Detective McDerby spoke with Detective Anthony Pantalone from the Evidence Detection Unit ("Detective Pantalone"). Detective McDerby stood by while Detective Pantalone processed the scene.

---

[2] A72 (Detective Tenebruso Testimony). At trial, Detective Tenebruso stated that he noticed that the time stamp on the surveillance video was roughly fifty-one minutes fast. Detective Tenebruso made this determination by comparing the live feed time to his cell phone. A73 (Detective Tenebruso Testimony).

Detective Pantalone collected various items and dusted the front counter with fingerprint powder. In total, Detective Pantalone obtained seven latent prints.[3] He placed this evidence in a sealed envelope and submitted the sealed envelope to the State Bureau of Identification for review by forensic latent print examiner and Automated Fingerprint Identification System ("AFIS") section administrator, Anthony DiNardo ("DiNardo").[4]

C. *The Identification of Pierce*

DiNardo analyzed the seven latent prints obtained by Detective Pantalone from the Second Robbery. Two of the latent prints were from the register counter.[5] The other prints were of no value or relevance to the case.[6] DiNardo submitted the prints to AFIS, an automated computer database that identifies possible matches for latent prints of unknown origins. The AFIS report showed that the two latent prints found on the sales counter belonged to Pierce or to nine other individuals.[7] DiNardo manually analyzed, compared, and evaluated the two latent prints from the front counter to "known prints that were already on file" in the AFIS system and determined with one hundred percent certainty that

---

[3] A144 (Detective Pantalone Testimony); A157–58 (DiNardo Testimony).

[4] A148, A156–57 (DiNardo Testimony).

[5] A158 (DiNardo Testimony).

[6] A158 (DiNardo Testimony). A third print, referred to as Latent Print 1 by DiNardo, (Pantalone's Lift Print 3) was from a business card that was processed by Detective Pantalone. The print was entered into AFIS and matched to a Savannah Mitchell (whose name was on the card). A162–63 (DiNardo Testimony). There is no suggestion in the record that she had any involvement in this matter.

[7] A158 (DiNardo Testimony) (stating that "AFIS sent me back what it thought were the ten closest matches," and that, "Mr. Pierce was the [n]umber 1 match in each of those responses").

4

they were a match to Pierce.[8]  The State entered into evidence Exhibit 58, DiNardo's analysis report, which had been premarked without objection.  Pierce's counsel advised the Superior Court that he had no objection to its admission.[9]

## D. The Proceedings in Superior Court

### 1. Indictment and Waiver of Right to Jury Trial

On December 17, 2018, Pierce was indicted on two counts of Robbery First Degree, two counts of Aggravated Menacing, two counts of Wearing a Disguise During the Commission of a Felony, and two counts of Felony Theft over $1,500.

On September 24, 2019, Pierce waived his right to a jury trial and consented to a bench trial.  Prior to trial, the State entered a *nolle prosequi* on two counts of Aggravated Menacing and one count of Felony Theft.

### 2. The Bench Trial

The State called Kalyanapu, Detective Tenebruso, Detective Harach, Detective McDerby, and DiNardo to testify.[10]  Pierce's counsel did not call any witnesses, and Pierce did not testify at trial.  We summarize the evidence relevant to our resolution of the issues presented.

---

[8] A158–59, A161–62 (DiNardo Testimony).

[9] Detective DiNardo testified that a second report, Exhibit 44, was prepared to correct a discrepancy in the number of business cards that he detailed in the first report.  Exhibit 44 was entered without objection.  A165 (DiNardo Testimony).

[10] Delaware State Police Trooper Duane Freeman also testified, however, his testimony does not directly affect the issues before us.

5

### a. Anesh Kalyanapu

On direct examination by the State, Kalyanapu testified about both robberies. In the First Robbery, the armed robber ordered Kalyanapu to put all the cash from both registers in a plastic bag and to give him a bottle of Rémy Martin cognac from behind the counter. Kalyanapu complied with the armed robber's demands, the armed robber exited, and Kalyanapu thereafter called 911. Kalyanapu remained on the phone with the 911 operator until two Delaware State Troopers arrived on the scene.

Kalyanapu described the armed robber as a young black male, between the ages of twenty-two to twenty-five, who wore a disguise consisting of a gray hoodie, a handkerchief over his nose, and a hat.

In the Second Robbery, an armed robber entered the store and ordered Kalyanapu to give him money from both registers. According to Kalyanapu, he replied: "Again?" The armed robber responded: "Yeah, again. Hurry up. Stop playing with me."[11] As in the First Robbery, the armed robber asked for a pint of Rémy Martin. After Kalyanapu complied, the armed robber fled, and Kalyanapu called 911.

Again, Kalyanapu was unable to see the armed robber's face. Kalyanapu described the armed robber as a black man who wore a thin yellow hoodie with black or gray horizontal stripes, shorts, a hat, and a handkerchief over his nose. Kalyanapu testified that he was not sure if it was the same person. When Kalyanapu was questioned by the State about the armed robber's voice, he stated that the armed robber had a deep voice. When

---

[11] A49 (Kalyanapu Testimony).

6

the State asked Kalyanapu whether the armed robber's voice sounded the same in both robberies, Kalyanapu stated that it did seem like the armed robber in both robberies had the same voice. He also stated that the robber had a gun, but it was a different gun.

On cross-examination, Pierce's counsel asked Kalyanapu about his prior statement regarding feeling a gun pressed into his back. Kalyanapu clarified and stated that he was "a little confused" and "[t]hat did not happen."[12]

### b. Detective Anthony Tenebruso

On direct examination by the State, Detective Anthony Tenebruso testified about the First Robbery, his course of conduct during the investigation, and his search of Pierce's known residence.

Following the First Robbery, Detective Tenebruso was called to the scene. In his role as Chief Investigating Officer, he spoke with the two state troopers on the scene and interviewed Kalyanapu. He called the State's Evidence Detection Unit after he viewed Silverside Discount Liquors' surveillance system and observed that the armed robber had not worn gloves during the robbery.

Detective Tenebruso was unable to locate additional surveillance cameras in the area or any witnesses to the First Robbery. Unable to develop a suspect, Detective Tenebruso generated a wanted flyer using a still photograph from the surveillance video and disseminated it to local law enforcement. The dissemination of the photograph generated no useful responses.

---

[12] A66 (Kalyanapu Testimony).

After the Second Robbery and Pierce's subsequent arrest, Detective Tenebruso, learned that Pierce resided at 804 West 34th Street. After Pierce was processed in connection with the arrest warrant, Detective Tenebruso obtained a search warrant for that residence to search for clothing, handguns, or anything else that could connect Pierce to the robbery. He did not find anything of value or anything else that belonged to Pierce in that house. Detective Tenebruso also testified that he determined Pierce's cell phone number and attempted to obtain data that would show which cell towers Pierce's phone was connected to during the time of the robberies. However, there was no data regarding the whereabouts of Pierce's cell phone at the time of either robbery.

On cross-examination, Pierce's counsel questioned Detective Tenebruso concerning the efforts he made to identify the getaway vehicle. Detective Tenebruso testified that the getaway vehicle was located too far away from the surveillance camera and, thus, he could not find any identifiable information. He also testified that he did not use any investigative techniques, such as enlargement or enhancement of the image in the video, in an attempt to isolate any details concerning the getaway vehicle.

### c. *Detective Timothy Harach*

On direct examination by the State, Detective Timothy Harach ("Detective Harach"), an evidence detective with the Delaware State Police Evidence Detection Unit, testified about the First Robbery. Following the First Robbery, he responded to the scene. After he reviewed the surveillance video, he observed that the armed robber had touched

the top of the sales counter, the right entrance door to the store, and a "lottery printout."[13]

He processed the sales counter and right entrance door with latent fingerprint dust and

collected the lottery printout to process at the station. Detective Harach was unable to lift

anything "of value" from the sales counter, right entrance door, or from the lottery printout.

He explained at trial that it is not uncommon to be unable to lift latent prints and that it is

possible for someone to touch something without leaving a latent print.

Pierce's counsel did not conduct a cross-examination.

### d. Detective Brian McDerby

On direct examination, Detective Brian McDerby ("Detective McDerby") from the

Criminal Investigative Unit, testified about the Second Robbery. Following the Second

Robbery, he responded to Silverside Discount Liquors. Detective McDerby met with the

first responding officer and interviewed Kalyanapu. Afterwards, Detective McDerby

reviewed with Detective Pantalone the segments of the video to identify areas that may

have been touched by the suspect so that those areas could be processed for fingerprints.

Detective McDerby testified that he was informed by Kalyanapu that the neighbor

witnessed the suspect. Detective McDerby explained that, although the witness saw an

individual wearing a yellow shirt walking south toward the store with a mask on, the

witness's statement did not add anything of value to his investigation. Detective McDerby

interviewed Pierce and testified that, prior to the interview, he did not inform Pierce about

---

[13] A89 (Detective Harach Testimony). Detective Harach described the lottery printout as a 9 x 11 piece of paper. *Id.*

9

the robberies or what specific location Pierce was suspected of robbing. The interview, Exhibit 56, was played during the trial.

On cross-examination, Pierce's counsel questioned Detective McDerby about Pierce's statement during the interview concerning the alcohol Pierce consumes. Detective McDerby testified that Pierce stated that he typically drinks Grey Goose, but Pierce said nothing about Rémy Martin.

### e. Detective Anthony Pantalone

On direct examination by the State, Detective Pantalone testified about his collection of latent prints from the Second Robbery. Following the Second Robbery, Detective Pantalone photographed the scene, collected various items, and processed the front counter with latent fingerprint powder. He later processed the collected items using a variety of methods. In total, Detective Pantalone obtained seven latent prints.[14] He placed the evidence in a sealed envelope and submitted the sealed envelope to the State Bureau of Identification for review by forensic latent print examiner and AFIS section administrator, DiNardo.[15]

On cross-examination, Pierce's counsel questioned Detective Pantalone about the inability to determine the timing of latent prints. Detective Pantalone testified that he cannot determine the age of a print and can only tell whether prints are present or not.

---

[14] A144 (Detective Pantalone Testimony); A157–58 (DiNardo Testimony). Detective Pantalone collected four business cards, six football calendars, a cigarette mat, and a lottery receipt. A122 (Detective Pantalone Testimony).

[15] A148, A156–57 (DiNardo Testimony).

### f. Anthony DiNardo

On direct examination by the State, DiNardo's described his analysis of the latent print evidence collected from the Second Robbery and the seven latent prints obtained by Detective Pantalone from the Second Robbery. Of the seven latent prints, only three had value: the two latent prints found on the sales counter and the one latent print found on a business card.[16]

DiNardo submitted the prints to AFIS and received positive matches. According to AFIS, the latent print found on a business card, identified as Detective Pantalone's Lift Print Three, was a match to Savannah Mitchell.[17] For the two latent lifts from the front counter, AFIS identified a total of ten possible matches. However, the number one match indicated DiNardo's Latent Prints Two and Three belonged to Pierce. DiNardo testified that he manually analyzed, compared, and evaluated Latent Prints Two and Three from the front counter to "known prints that were already on file" in the AFIS system and determined, with one hundred percent certainty, that they were a match to Pierce.[18]

DiNardo also testified as to the unique nature of fingerprints. He noted limitations regarding fingerprint evidence in that a person can touch a surface without leaving a print

---

[16] A158–62 (DiNardo Testimony). DiNardo's Latent Print 1 is Detective Pantalone's Lift Print 3, DiNardo's Latent Print 2 is Detective Pantalone's Lift Print 2, and DiNardo's Latent Print 3 is Detective Pantalone's Lift Print 1. *Id.*

[17] A162–63 (DiNardo Testimony) (explaining that State's Trial Exhibit Number 47 is a business card, which is identified as Latent Print 1, which in turn is Detective Pantalone's Lift Print 3).

[18] A159–62 (DiNardo Testimony); *see also* State's Tr. Exs. 45–46 (Register Counter Palmprints).

of any value or any prints at all, and that latent prints are fragile and are subject to environmental conditions.

On cross-examination, Pierce's counsel questioned DiNardo regarding the methodology he used when he analyzed the latent prints. DiNardo stated that he used the "ACE-V" methodology to analyze the latent prints. ACE-V is an acronym for Analysis, Comparison, Evaluation and Verification. Under this system, one latent print examiner, in this case DiNardo, conducted the "ACE" phase. A second latent print examiner, in this case, Detective Kevin Rocco Murphy ("Detective Murphy"), from the New Castle County Police Department, conducted the verification ("V") phase. During cross-examination, an issue concerning the Verification phase arose.[19] DiNardo testified that Detective Murphy had verified the comparisons. Pierce's counsel objected to that testimony on hearsay grounds and the court indicated that it would not consider the verification notation or DiNardo's testimony regarding it.[20] The State, thereafter, indicated that it would call Detective Murphy to testify, but Pierce's counsel objected on the grounds that Detective Murphy had not been disclosed as an expert during discovery. When the trial judge inquired as to whether Pierce was contending that DiNardo's testimony was disqualified, Pierce's counsel agreed that DiNardo's testimony was not disqualified and instead, the

---

[19] A168–73 (DiNardo Testimony).

[20] A171 (DiNardo Testimony).

issue regarding Murphy's verification of the comparisons would merely affect the weight of DiNardo's testimony.[21]

### 3. *The Verdict*

On September 26, 2019, the trial judge delivered the verdict. The trial judge found Pierce guilty of all remaining charges and revoked bail.[22]

Immediately thereafter, Pierce fled the courtroom.

### 4. *Pierce's Motion for a New Trial*

While sentencing was pending, Pierce's counsel filed a Motion for a New Trial on the basis of what he alleged to be newly discovered evidence. Pierce argued that the newly discovered evidence, namely, phone records, showed that the cell phone was in use (sending outgoing texts) during the First Robbery and was used for outgoing calls immediately after the Second Robbery. Thus, he argued that this evidence raised a reasonable doubt that he was the robber. However, an examination of the phone records revealed that when adjusted for the correct time zone, the records did not support Pierce's theory. Accordingly, the trial judge denied Pierce's Motion.

### 5. *Sentencing*

On November 13, 2020, the Superior Court sentenced Pierce to an aggregate of six years incarceration followed by descending levels of supervision for the counts related to

---

[21] A204 (Detective Tenebruso Testimony). ("The Court: Understood. But you're not saying his testimony is disqualified? [Pierce's Counsel]: I'll not argue that, no, Your Honor."). *Id. See also* Opening Br. at 27.

[22] A270 (Verdict Tr.). Count I: Robbery First Degree; Count III: Wearing a Disguise During the Commission of a Felony; Count IV: Felony Theft; Count V: Robbery First Degree; and Count VII: Wearing a Disguise During the Commission of a Felony. *Id.*

the robberies (Counts I, III, IV, V and VII). Pierce received an additional year of incarceration for fleeing the courthouse following the delivery of his verdict. Pierce filed a timely appeal.

### E. The Appeal

Pierce appeals his convictions on two grounds. *First*, he contends that the Superior Court committed plain error by admitting unauthenticated palmprints into evidence. He asserts that the palmprints were unauthenticated because "no evidence was introduced regarding when the prints were obtained, under what circumstance, by whom, how they had been maintained, or how the witness could possibly know the prints were Pierce's[.]"[23]

*Second*, Pierce argues that there was insufficient evidence identifying Pierce as the suspect who robbed Silverside Discount Liquors.

The State counters that Pierce affirmatively waived any challenges to the admission of fingerprint evidence. Moreover, the State argues that the Superior Court did not commit plain error when it permitted the State to introduce the AFIS prints. Finally, the State argues that there was sufficient evidence to convict Pierce of both robberies.

### II. Standard of Review

First, with respect to Pierce's lack of authentication claim, claims not raised before the trial court in the first instance are reviewed for plain error.[24] The trial court commits plain error when the error complained of is so clearly prejudicial to a defendant's

---

[23] Opening Br. at 13.

[24] *Harris v. State*, 198 A.3d 722, 2018 WL 6431552, at *3 n.10 (Del. Dec. 5, 2018) (TABLE) (citing to *Chance v. State*, 685 A.2d 351, 354 (Del. 1996)).

14

substantial rights as to jeopardize the fairness and integrity of the trial.[25]   Pierce acknowledges that his challenge to the admissibility of the palmprint evidence was not raised below.[26]

Second, we review *de novo* a defendant's sufficiency of the evidence claim by asking whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of the crimes charged.[27]

### III.    Analysis

#### A.  Admission of Fingerprint Evidence

Pierce's main objection to the palmprint evidence is that the State did not offer witness testimony to authenticate that the palmprint records contained within the AFIS database were in fact Pierce's.  Moreover, he asserts that any testimony provided to authenticate AFIS latent print evidence should be provided by a witness with personal knowledge.

The State contends that Pierce waived this claim of error.  We agree.

At trial, the State introduced into evidence the latent fingerprint impressions collected by Detective Pantalone during his investigation of the Second Robbery.  Pierce

---

[25] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[26] Opening Br. at 13 (Identifying his first issue on appeal as "[w]hether the trial court committed plain error by admitting palmprints, alleged to be Pierce's 'known prints' into evidence" and acknowledging that, "[t]his claim was not raised below.").

[27] *Chavis v. State*, 227 A.3d 1079, 1088 (Del. 2020), *cert. denied,* 141 S. Ct. 1528, 209 L.Ed.2d 260 (2021); *see also Monroe v. State*, 652 A.2d 560, 563 (Del. 1995).

did not object. The State then called DiNardo who testified about the comparison he performed on the latent fingerprint impressions collected by Detective Pantalone. Pierce did not object.[28] In fact, Pierce did not object to the admission of any of the State's exhibits, which included the video evidence, still shots from the video, and exhibits showing the palmprints.[29] The State introduced into evidence DiNardo's report (Exhibit 58) documenting his comparison of the latent prints against the prints generated by AFIS and identified as Pierce's prints.[30] Pierce affirmatively stated that he had no objection to the admission of this key report.[31] Although Pierce claims his counsel affirmatively waived

---

[28] The following exchange at trial occurred:

> [The State]: Okay. How did you ultimately come to comparing Latent Lift 1 and Latent Lift 2 to the latents of this defendant?
>
> [DiNardo]: Okay. So since we did not have somebody to compare these prints to initially, I entered them into AFIS. AFIS sent me back what it thought were the ten closest matches. Mr. Pierce was the Number 1 match in each of those responses. And I made my analysis and my comparison using, then, his known prints that were already on file and the latent print from the register counter.
>
> [The State]: All right. Now, do you have a print-out that shows your examination of the comparison between the defendant's print and both Latent 1 and Latent 2?
>
> [DiNardo]: It's a screen shot, yes.
>
> [The State]: Okay. I'm going to put on the screen, then, for you what's been premarked, without objection, as State's Exhibit 45. Okay?
>
> [The Court]: [Pierce's Counsel]?
>
> [Pierce's Counsel]: No objection, Your Honor.

A158–59; *see also* Reply Br. at 1.

[29] A261–62 (Verdict Tr.).

[30] A163–65. Exhibit 58 states that "latent print impression number two (2), labeled L2 from the register counter, is a print impression of the Subject Pierce's left palm," and that "latent print impression number three (3), labeled L1 from the register counter, is a print impression of the Subject Pierce's left palm." State's Tr. Ex. 58 (DiNardo Analysis Report).

[31] As the trial transcript reflects, Pierce's counsel affirmatively stated that he had no objection to the admission of Exhibit 58:

only his objection to the "V" portion of testimony relating to the ACE-V process, his counsel informed the trial judge that he had no objection to the admissibility of DiNardo's palmprint report generally, to certain other related exhibits,[32] or to the court's consideration of DiNardo's testimony.[33]

Pierce did not file a pretrial motion *in limine* raising the authentication issues he now presses. Thus, the State had no notice or opportunity to respond to the challenges Pierce now raises on appeal for the first time. The prejudice to the State is evident. For example, on appeal, Pierce argues that the State should have used Pierce's arrest prints and not his AFIS prints. At oral argument, the State stated that using the arrest prints was the usual practice but surmised that there were extenuating circumstances that may have caused the State to use the AFIS prints.[34] But importantly, had the State known there was

---

> [The State]: All right. I am now going to put up on the screen what's been premarked, without objection. I actually don't think it's been marked. If I can approach to get it marked, Your Honor?
>
> THE COURT: Yes.
>
> [Defense Counsel]: No objection, Your Honor.
>
> (Whereupon, State's Exhibit No. 58 was admitted into evidence.).

A164 (DiNardo Testimony).

[32] *See, e.g.,* A158–59 (DiNardo Testimony).

[33] *See* Opening Br. at 27 ("While trial counsel elected not to challenge the admissibility of the prints or corresponding testimony, the absence of verification still has a significant impact on the weight of the evidence.").

[34] *See* Oral Argument video 23:26–24:15 https://livestream.com/delawaresupremecourt/events/9878244/videos/227079971. For example, the State advised this Court that Pierce was incarcerated when his arrest warrant was being obtained and executed. Pierce was brought from the Howard Young Correctional facility to Troop 2 for processing. *See* A190–91 (Detective Tenebruso Testimony).

a challenge to the authenticity of the AFIS prints, the State could have addressed it at the time.

This Court has indicated on many occasions that the time to object to the admission of evidence is at trial, not for the first time on appeal. "On evidentiary issues, the general rule is that evidentiary questions may not be raised for the first time on appeal."[35] Thus, "failure to object to the admissibility of evidence in the trial court may preclude a party from raising the objection for the first time on appeal."[36]

Rule 103 of the Delaware Rules of Evidence ("Rule") requires a party to object to evidence presented during trial or risk losing the right to raise that issue on appeal.[37] Failure to object at trial constitutes a waiver of that party's right to raise that issue on appeal unless the error is plain.[38] Rule 103(e) "allows the appellate court to take notice of 'plain errors affecting substantial rights' of the parties on appeal, even though the error was not

---

[35] *Wainwright*, 504 A.2d at 1100 (citing *Stevenson v. Henning*, 268 A.2d 872, 873 (Del. 1970)).

[36] *Id*. (citations omitted).

[37] *Id.*; D.R.E. 103(a). Rule 103(a) provides in full:

> (a) Preserving a Claim of Error. A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and:
>> (1) if the ruling admits evidence, a party, on the record:
>> (A) timely objects or moves to strike; and
>> (B) states the specific ground, unless it was apparent from the context; or
>> (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

D.R.E. 103(a).

[38] *Capano v. State*, 781 A.2d 556, 653 (Del. 2001); *Goddard v. State*, 382 A.2d 238, 242 (Del. 1977).

brought to the attention of the trial court."[39]  Under the plain error standard of review, the

error complained of must be so clearly prejudicial to substantial rights as to jeopardize the

fairness and integrity of the trial process.[40]  Accordingly, any claim related to the admission

of the palmprint evidence is waived on appeal as a result of a failure to object unless the

admission of that evidence amounts to plain error.[41]  But here, we have not only a failure

to object, but Pierce's counsel's affirmative statements to the court agreeing to the

admission of the key palmprint evidence.  Under these circumstances, we conclude that he

has waived his claim of error relating to the authentication of the palmprints.[42]

We value the assessment of issues by our trial courts and have often recognized that

crafting new rules absent presentation of the issue below can be inefficient and potentially

unfair to litigants.[43]  Despite the fact that Pierce never presented his authentication

---

[39] *Wainwright*, 504 A.2d at 1100; D.R.E. 103(e) ("A court may take notice of a plain error affecting a substantial right, even if the claim of error was not properly preserved.").

[40] *Dutton v. State*, 452 A.2d 127, 146 (Del. 1982).

[41] *Green v. St. Francis Hosp., Inc.*, 791 A.2d 731, 741 (Del. 2002) (citing Supr. Ct. R. 8).

[42] *See, e.g., Stevenson v. State*, 149 A.3d 505, 516 (Del. 2016) ("As this Court explained in *King v. State*, there is an express and effective waiver as to any appellate presentation on an issue where defense counsel responds to queries by a trial judge, by stating that there are no objections to the admission of evidence.  Indeed, such affirmative statements are a stronger demonstration of a waiver 'than the mere absence of an objection.'") (footnotes omitted) (quoting *King v. State*, 239 A.2d 707, 708 (Del. 1968); *see also King*, 239 A.2d at 708 (stating that, "[t]he instant case is not a case of silence and failure to object; this is, rather, a case of an affirmative waiver."); Opening Br. at 27 (acknowledging that "trial counsel *elected* not to challenge the admissibility of the prints or corresponding testimony") (emphasis added).

[43] *See, e.g., DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 363 (Del. 2017) (explaining that this Court places "great value on the assessment of issues by our trial courts, and it is not only unwise, but unfair and inefficient, to litigants and the development of the law itself, to allow parties to pop up new arguments on appeal they did not fully present below"); *Wainwright*, 504 A.2d at 1100 ("This Court, in the exercise of its appellate authority, will generally decline to review contentions not raised below and not fairly presented to the trial court for decision.").

arguments to the trial court, we offer some guidance by way of general guideposts in the context of certain arguments he has made to this Court.

Pierce argues that despite DiNardo's "leading role at AFIS," he "did not explain his level of involvement, if any, with obtaining prints, submitting entries into AFIS, managing the database, or ensuring its accuracy."[44] In this bench trial, DiNardo did provide certain basic foundational testimony about AFIS.[45] Retired Detective DiNardo was, at the time of his trial testimony, the AFIS section administrator, and the forensic latent print examiner at the State Bureau of Identification, which is a division of the Delaware State Police. He described the AFIS system generally and was a witness with knowledge of the AFIS database. He described AFIS as "the repository for fingerprints" and said that he was involved in doing criminal histories, professional licensing, background checks, and forensic analysis of fingerprints, palmprints, and latent prints collected at crime scenes from across the state.[46] He explained generally the contents of the database and how prints may come to be in the database.[47] He also explained the process he employed in comparing latent prints to latent print records, and the basis upon which he concluded that the AFIS latent prints matched Pierce's with 100 percent certainty.

---

[44] Opening Br. at 18.

[45] We agree with the State's general observation at oral argument that the Superior Court judges have a basic familiarity with AFIS. The State also recognized that more basic foundational detail may be required about the AFIS system in a jury trial. Oral Argument video 22:06–22:28 https://livestream.com/delawaresupremecourt/events/9878244/videos/227079971.

[46] A148–49 (DiNardo Testimony).

[47] A173–76 (DiNardo Testimony). DiNardo testified, for example, that people "get fingerprinted in Delaware for background checks for a variety of things," that "I have as of today over 600,000 palmprints in that database" of persons both living and deceased. A175 (DiNardo Testimony).

To satisfy the authentication requirement of Rule 901(a), the proponent must produce sufficient evidence to support a finding that the item is what the proponent claims it is.[48] The burden for authentication is relatively low.[49] Even though the burden is low, and the means of satisfying it are not rigid, the State must, in order to authenticate "known" prints, provide some evidence from which a reasonable finder of fact would have a rational basis to conclude that the prints derived from the database and used for comparison purposes with the crime scene prints are the defendant's.[50] There is no single blueprint for how this lenient burden may be satisfied, and there may be multiple ways to meet the burden, even within a case, depending on the circumstances.[51]

Pierce has identified a few instances where courts have specifically addressed what is required in the way of evidence needed to authenticate prints in the AFIS database as the defendant's "known" prints.[52] For example, pointing to the Supreme Court of South

---

[48] D.R.E. 901(a). *See Schaffer v. State*, 184 A.3d 841, 2018 WL 1747793, at *5 (Del. Apr. 10, 2018) (TABLE) ("It is an 'inherent logical necessity' that evidence should not be admitted unless the party offering it can show that the evidence is what it is claimed to be.") (quoting 7 John Henry Wigmore, *Evidence in Trials at Common Law* § 2129 (James H. Chadbourn rev., 1987)).

[49] *See, e.g., Mills v. State*, 131 A.3d 806, 2016 WL 152975, at *1 (Del. Jan. 8, 2016) (TABLE) ("The burden of authentication is a lenient one."); *Cabrera v. State*, 840 A.2d 1256, 1264–65 (Del. 2004) ("The burden of authentication is easily met.").

[50] *See Schaffer*, 184 A.2s 841, 2018 WL 1747793, at *5 ("The proponent need not conclusively prove the evidence's authenticity, but merely provide a 'rational basis' from which a reasonable finder of fact could draw that conclusion.") (citing *Cabrera*, 840 A.2d at 1264–65).

[51] *See Schaffer*, 184 A.3d 841, 2018 WL 1747793, at *5 (stating that, "[t]here are no hard-and-fast rules about how" the State should satisfy the authentication requirement and "[t]he proponent can point to 'witness testimony, corroborative circumstances, distinctive characteristics,' or other evidence probative of authenticity") (citing *Parker v. State*, 85 A.3d 682, 687–88 (Del. 2014) (rejecting imposing a heightened authenticity requirement—or other special requirements—to evidence of social media posts)).

[52] *See, e.g., State v. Rich*, 359 S.E.2d 281, 282 (S.C. 1987) (reversing a conviction because although the latent prints that the law enforcement agent had taken himself were properly authenticated, the

Carolina's decision in *State v. Rich*,[53] Pierce argues that personal knowledge of the person who took the fingerprints is needed "to properly authenticate 'known fingerprints.'"[54] However, we observe that in a later case, *State v. Anderson*,[55] the Court of Appeals of South Carolina rejected this interpretation of *Rich*, stating that, "[w]e do not believe *Rich* stands for such a strict authentication requirement," namely, that the State must present the actual person who took the fingerprint to testify in order to authenticate the fingerprints from the master file card.[56] The South Carolina Supreme Court affirmed that decision and agreed that "*Rich* does not establish an authentication requirement that necessitates the testimony of the actual person who took the fingerprints on the master fingerprint card. Instead, it merely requires 'evidence as to *when and by whom* the card was made and that the prints on the card were in fact those of this defendant.'"[57] We agree with the Supreme Court of

---

inked impressions used to compare to the latent prints were not properly authenticated and the State "neither attempted to lay a foundation that the fingerprints on the master file card were in fact those of the defendant, nor sought to introduce the master file card"); *State v. Foster*, 200 S.E.2d 782, 793 (N.C. 1973) (prosecution neither attempted to lay a foundation that the fingerprints on the master file card were in fact those of the defendant nor sought to introduce the master file card and holding that "[w]ithout evidence as to when and by whom the card was made and that the prints on the card were in fact those of this defendant," testimony concerning the fingerprint card from the master file "violated the hearsay rule and should have been excluded"); *Louis v. State*, 647 So.2d 324, 325–26 (Fla. Dist. Ct. App. 1994) (explaining that when the State failed to properly authenticate fingerprint cards, the cards were erroneously admitted, and there was insufficient proof that the defendant was the perpetrator of the predicate offenses as required for habitual violent felony offender sentencing).

[53] *Rich*, 359 S.E.2d 281.

[54] Opening Br. at 16–17.

[55] 662 S.E.2d 461 (S.C. Ct. App. 2008) [hereinafter *Anderson I*], *aff'd* 687 S.E.2d 35 (S.C. 2009) [hereinafter *Anderson II*].

[56] *Id.* at 464.

[57] *Anderson II*, 687 S.E.2d at 39 (citing *Anderson I*, 378 S.C. at 248) (emphasis in original). *See also State v. Heyward*, 852 S.E.2d 452, 461 (S.C. Ct. App. 2020), *reh'g denied* (Jan. 15, 2021)

South Carolina that "[t]o require this type of testimony [namely, the testimony of the person who actually took the fingerprints] would create an unrealistic standard and, at times, an insurmountable obstacle for the State."[58]

Our Rules of Evidence suggest a more flexible approach than what Pierce advocates.[59] Indeed, the South Carolina Supreme Court, in *Anderson*, in rejecting this overly narrow approach, noted that *Rich* had been decided prior to that state's adoption of the Rules of Evidence, and it discussed cases where several provisions of Rule 901 had been applied, including Rule 901(b)(4), (b)(7) and (b)(9), to authenticate "known" prints. It also noted that, even if the evidence presented by the State in that case "did not precisely fit within one of the enumerated examples provided in Rule 901," the defendant's ten-print card, was nevertheless, "authenticated under a more generalized approach to Rule 901."[60] We reject Pierce's overly rigid formulation, and instead acknowledge that there may be

---

(affirming trial court and finding fingerprints from AFIS database were properly authenticated under Rule 901(b)(3) when investigator compared them with the authenticated booking fingerprints).

[58] *Anderson II*, 687 S.E.2d at 41.

[59] *See Cabrera*, 840 A.2d at 1265 (To satisfy the authentication requirement, the State need only "establish a rational basis from which the jury could conclude that the evidence is connected with the defendant.") (citing *Williams v. State*, 568 A.2d 1073, 1989 WL 1554710, at *1 (Del. Dec. 4, 1989) (TABLE)); *id.* (observing that the link between the defendant and the evidence "need not be conclusive," and that "[a]n inconclusive link diminishes the weight of the evidence but does not render it inadmissible") (citing *Ward v. State*, 575 A.2d 1156, 1160 (Del. 1990)); *see also* D.R.E. 901(b) (stating that the examples of authentication listed in D.R.E. 901(b) "are examples only — not a complete list — of evidence that satisfies the requirement"); D.R.E. 901(b)(1), 901(b)(4), 901(b)(7) and 901(b)(9).

[60] *Anderson II*, 687 S.E.2d at 41. In this regard, the court referred to the testimony of a law enforcement officer who was qualified as an expert in fingerprint analysis, whose testimony included a thorough explanation of how an arrestee's fingerprints are taken, stored, and maintained. *Id.* Using the officially-maintained known fingerprints, he opined that the latent print found in the victim's home matched the defendant's print in the AFIS database. *Id.* at 131–32.

various ways to authenticate a defendant's "known" prints depending on the circumstances.[61] Our speaking more precisely on the issue now, given that the trial court has not considered it and our conclusion that Pierce has waived the issue, would risk

---

[61] *See, e.g., State v. Boyd*, 796 S.E.2d 207, 232 (W. Va. 2017) (affirming the admission and authentication of fingerprint records under Rule 901(b)(7)); *United States v. Rodriguez*, 409 F. App'x 866, 871 (6th Cir. 2011) (finding that a fingerprint card was properly relied on and authenticated under Fed. R. Evid. 703 and 901); *State v. Foreman*, 954 A.2d 135, 153–62 (Conn. 2008) (the State established a proper foundation for admission of a "live-scan" fingerprint card identified as that of defendant under Rule of Evidence 901 where "highly trained" latent fingerprint examiner testified regarding the methodology used to compare known and unknown fingerprints and his conclusion that the print from defendant's finger was a "100 percent match" with the unknown print obtained from the crime scene.); *United States v. Lauder*, 409 F.3d 1254, 1265–66 (10th Cir. 2005) (finding fingerprint evidence authenticated under F.R.E. 901 (b)(4) and also observing that the "authenticity of a fingerprint card may be inferred from circumstantial evidence"); *State v. Carruth*, 166 S.W.3d 589, 591 (Mo. Ct. App. 2005) (AFIS fingerprint card was admissible under business records exception to hearsay rule where witness, who did not take the actual prints, established the standard procedures used by the jurisdiction to collect and maintain fingerprints and testified regarding her determination that the latent prints and known prints came from the defendant); *State v. DuBray*, 77 P.3d 247, 259–60 (Mont. 2003) (based on Rule 901(b)(7), known fingerprint card of person was properly authenticated where it was preserved by law enforcement and thus, constituted a "public report or record"); *United States v. Patterson*, 277 F.3d 709, 713–14 (4th Cir. 2002) (holding, pursuant to Federal Rule of Evidence 901(b)(4), that the government provided sufficient authentication of a Digital Biometrics Tenprinter image where testimony that one of the fingerprints recorded by the Tenprinter matched the fingerprint recovered from the crime scene evidence); *State v. Lee*, 577 So.2d 1193, 1196 (La. Ct. App. 1991) (finding original fingerprint card was properly authenticated under Rule 901(b)(4) where testimony was offered regarding the signatures on the card, the law enforcement agency where the prints were taken, and the dates the prints were taken, and under Rule 901(b)(7), because the fingerprint card was a writing authorized by law to be recorded and filed with the police department); 31 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 7112 (2d ed.) (listing "fingerprint cards" among the types of writings that may be authenticated under Rule 901(b)(7)); *see also* D.R.E. 901(b)(1), 901(b)(4), 901(b)(7), 901(b)(9); *Anderson II*, 687 S.E.2d at 40 (the State properly authenticated the ten-print card under Rule 901(b)(7) as a business record and under 901(b)(9) by presenting evidence as to "when and where [the appellant's] fingerprints were taken, how they were submitted to [South Carolina Law Enforcement Division]; the process implemented by law enforcement for taking the fingerprints; and how an accurate record of them was maintained in the AFIS").

creating unnecessary inefficiencies, inflexibility, and potential injustice to parties, and would be out of step with the way our common law develops on a case-by-case basis.[62]

Accordingly, we hold that in this case, based upon Pierce's counsel's affirmative statements on the record that Pierce had no objection to the admission of the print evidence report (as explained during DiNardo's testimony), the prejudice to the State in having to address Pierce's challenges after the fact, and the totality of the record before us, Pierce waived his objections to the admission of the palmprint evidence. Further, we reject Pierce's assertion that the trial judge, *sua sponte*, should have declined to admit the palmprint evidence under these circumstances.

B. *Sufficiency of the Evidence*

Secondly Pierce challenges the sufficiency of the evidence supporting his conviction. We reject that challenge as well.

In a state criminal proceeding, the Due Process Clause of the Fourteenth Amendment requires the government to prove the defendant's guilt by presenting sufficient evidence to establish every factual element of a charged offense beyond a reasonable doubt.[63] As the Superior Court stated, the court "must be satisfied beyond a reasonable

---

[62] *See, e.g., State v. Lawson*, 817 S.E.2d 509, 512, 513 (S.C. 2018) (reversing the conviction and finding that the trial court abused its discretion by admitting testimony that defendant's ten-print card originated from a correctional facility because that informed the jury that defendant had a prior criminal record and "the reference [to the correctional facility] was unnecessary to authenticate the fingerprints" and also noting that in *Anderson II*, the "supreme court explained alternative ways the State could authenticate ten-print cards maintained in AFIS").

[63] *In re Winship*, 397 U.S. 358, 364 (1970). The reasonable doubt standard is mandated by the United States Constitution in both state and federal prosecutions. *Id.* The Delaware Criminal Code also provides that, "[n]o person may be convicted of an offense unless each element of the offense is proved [by the State] beyond a reasonable doubt." 11 *Del. C.* § 301(b).

doubt that the defendant has been accurately identified, that the wrongful conduct charged in this case actually took place, and that the defendant was, in fact, the person who committed the act."[64] We must determine whether any rational trier of fact, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt of all elements of the crime.[65] "In making this inquiry, we do not distinguish between direct and circumstantial evidence, and in cases involving purely circumstantial evidence, the State need not disprove every possible innocent explanation."[66]

In this case, the State argues that this Court should consider: (i) the palmprint evidence, (ii) the surveillance video of both robberies, (iii) Kalyanapu's testimony that he believed both robberies were committed by the same person, (iv) Pierce's question during his interview concerning what evidence the police had possessed that he robbed a liquor store before allegedly being told that he was being investigated for the robbery of a liquor store, (v) Pierce's inability to recall whether he had ever been to Silverside Discount Liquors, and (vi) Kalyanapu's testimony that he had never seen Pierce in the liquor store.

During the trial, the State submitted 58 exhibits including latent palmprints and examination results, 911 calls, surveillance video, still shots from that surveillance video, Pierce's interview, DiNardo's CV, DiNardo's report, and associated diagrams. All evidence was submitted without objection.

---

[64] A268 (Verdict Tr.).

[65] *Cushner v. State*, 214 A.3d 443, 446 (Del. 2019).

[66] *Id*. (footnote omitted).

After a review of the record, we conclude that the evidence supports the identification of Pierce including, in particular, Detective Pantalone's palmprint lifts, the surveillance video evidence, still shots from that surveillance video, and also, but to a lesser extent, the physical description of the robber and the interview of Pierce.

As noted above, the First Robbery did not produce any latent prints; however, the Second Robbery did -- Lift 1 and Lift 2. According to Detective Pantalone, the surveillance footage shows that the suspect placed his left hand on the *left* side of the register area "on the blue part of the counter" and again "placed his left hand down again on the *right* side of the register area on the blue counter."[67]

DiNardo testified that the palmprint evidence revealed ten possible matches in the AFIS database.[68] However, for both lifts, AFIS determined that the number one match belonged to Pierce. DiNardo manually compared the prints and determined with absolute certainty that both lifts belonged to Pierce.[69] DiNardo testified that experts in the field of latent print identification typically seek a minimum of eight points of agreement between any particular lift and the latent print on record. DiNardo stated that both prints returned eleven points of agreement and no points in disagreement.[70]

Pierce contends that there is an approximate three-week period of time where the defendant could have placed his fingerprint in that location. Pierce's argument relies on

---

[67] A123–24 (Detective Pantalone Testimony) (emphasis added).

[68] A158 (DiNardo Testimony).

[69] A160–62 (DiNardo Testimony).

[70] A179–81 (DiNardo Testimony).

testimony in the record suggesting that the age of a fingerprint cannot readily be discovered, and that the sales counter is a generally-accessible and high trafficked area of the store. However, the video footage of the Second Robbery shows the armed robber pressing his palms against the counter in the same general location where Pierce's palmprints were lifted. Various still shots from the surveillance video showing the suspect's left hand placement on the counter were admitted into evidence. Several exhibits showed the robber's hand placement on one side of the exhibit and the location of the latent print left on the other side of the exhibit page.[71]

More specifically, the video surveillance from the Second Robbery shows that the suspect placed his left hand in two separate locations on the front sales counter.[72] For the first location, later identified as Lift 1 by Detective Pantalone, the video shows that the armed gunman pressed his left hand down in a manner that caused his palm to touch the counter while his fingers touched the lottery print-out slip.[73] Although Detective Pantalone was able to retrieve a partial latent print from the lottery print-out slip,[74] DiNardo was unable to obtain anything of value from the lottery print-out slip.[75] However, DiNardo was able to obtain a palmprint from the same general location that the armed gunman had

---

[71] *See, e.g.,* State's Tr. Ex. 48–49.

[72] State's Tr. Ex. 4 (Surveillance Video of Second Robbery).

[73] *See also* A161–62 (DiNardo Testimony); State's Tr. Exs. 48, 46.

[74] A140 (Detective Pantalone Testimony).

[75] A163 (DiNardo Testimony).

28

touched with his palm. DiNardo identified this palmprint, labeled Latent Print 3, as belonging to Pierce.[76]

For the second location, later identified as Lift 2 by Detective Pantalone, the video shows that the armed gunman pressed his left hand down above the letters "CK" in the word "CHECK." When Detective Pantalone surveyed the front counter for latent print evidence he was able to isolate Lift 2 from this same general area on the front counter.[77] DiNardo searched AFIS and determined that Lift 2 matched a latent print from the AFIS system belonging to Pierce.[78]

To hold that an individual may be convicted of a crime based solely on the presence of his palmprint found in a generally accessible and well-trafficked part of a retail store would likely create a high risk of wrongful convictions. However, in this case, this general concern is mitigated where the location of the suspect's palmprints is corroborated with video footage showing the suspect placing his hands in the same manner and place as the

---

[76] A180–81 (DiNardo Testimony) (Where Latent Print 3 is Detective Pantalone's Lift Print 1.); *see also* State's Tr. Ex. 48; A188 (Detective Tenebruso Testimony). While discussing Exhibit 48 (admitted without objection), Detective Tenebruso explained:

> This is interior still photographs from the surveillance video of Silverside Liquors. This is from the August 16th robbery. The left side photograph depicts the suspect placing his left hand on the check-out counter, on the top of the check-out counter. The right picture is where Detective Pantalone processed that area for a latent impression which he located on top of that counter.

A188 (Detective Tenebruso Testimony). The right side of Exhibit 48 shows where "L1" was lifted by Detective Pantalone.

[77] State's Tr. Ex. 32; State's Tr. Ex 49; A188–89 (Detective Tenebruso Testimony) (stating that, "[t]he left side picture indicates the suspect touching another portion of the check-out counter with his left palm," and "[t]he right picture indicates where Detective Pantalone processed the area where the suspect was observed touching on the surveillance video").

[78] A179 (DiNardo Testimony).

armed robber in the robberies.[79]  Therefore, under the circumstances of this case, the evidence surrounding the location and placement of the palmprints on the register counter supports the trier of fact's finding that Pierce's palms made those prints while committing the robberies.

This Court has considered the sufficiency of fingerprint or palmprint evidence on at least two prior occasions.  This Court's decision *Monroe v. State* provides some guidance.[80] In *Monroe*, an appliance store in Wilmington was burglarized in the early morning hours when the store was closed.  The point of entry was the lower half of the store's plexiglass front door.  Eight prints belonging to defendant Monroe were found on one of the broken pieces of plexiglass.  A total of thirty-one other prints were also found: seventeen of those belonged to someone other than Monroe, but investigators were unable to identify the prints' owner(s), and the other fourteen were of insufficient quality to make a comparison.

The Court in *Monroe* recognized that many jurisdictions "appear to have adopted the following rule in one form or another: a conviction cannot be sustained solely on a defendant's fingerprints being found on an object at a crime scene unless the State demonstrates that the prints could have been impressed only at the time the crime was committed."[81]  We held that "the range of abundant, innocent explanations for the presence of Monroe's prints on the plexiglass shards is too vast for any rational trier of fact to have

---

[79] State's Tr. Ex. 4 (Surveillance Video of Second Robbery).  *Compare* Ex. 32, 48, and 49, *with* Ex. 4.

[80] *Monroe*, 652 A.2d 560.

[81] *Id.* at 564.

30

found beyond a reasonable doubt an essential element of both charged offenses - namely, identity."[82] But this Court also recognized that "[e]vidence may be sufficient to sustain a conviction, however, where the circumstances surrounding a defendant's fingerprints create a strong inference that the defendant was the perpetrator."[83] Such circumstances include, but are not limited to:

> whether the prints were found in a private or public structure (*i.e.*, whether the object in question was generally-accessible); whether the defendant had any special access to the object in question which may provide an alternative explanation for the presence of the prints; and whether the manner of placement of the prints on the object is supportive of the defendant having placed them there while committing the charged offense.[84]

In *Monroe*, the Court held that the presence of defendant's latent fingerprints on the outside door to a burglarized commercial building was insufficient to convict the defendant, *in the absence of any other evidence in* the State's case-in-chief, because the front door was generally accessible to the public and there was no evidence whatsoever as to when his prints were left on the door. In other words, the fingerprints were found on plexiglass pieces from a door "that, in its natural use, tend[ed] to accumulate many fingerprints."[85] Notably, this Court carefully limited its holding: "[o]ur holding is limited

---

[82] *Id.* at 567 (internal quotation marks omitted).

[83] *Id.* at 564.

[84] *Id.* The Court in *Monroe* also examined case law from other states, both setting aside convictions and upholding convictions on the basis of sufficiency of evidence arguments. *See id.* at 564–65.

[85] *Id.* at 567.

to the facts before us today. We express no opinion on the sufficiency of fingerprint

evidence to establish guilt in cases involving different circumstances."[86]

    *Chavis v. State*,[87] a more recent decision by this Court, provides some guidance as

well. *Chavis* involved a burglary of an apartment located in Newark, Delaware. We were

tasked with analyzing an insufficiency-of-evidence claim where the evidence linking the

defendant to the crime included DNA, clothing appearing to match the clothing of the

suspect in numerous photographs, eyewitness accounts of the suspect, and surveillance

photographs that showed a suspect that resembled the defendant.[88] We determined that

sufficient evidence existed to convict the defendant.

    Here, although the palmprints were found in a public structure accessible by

members of the public, there was evidence concerning the manner and placement of the

prints that is supportive of Pierce having placed them there while committing the charged

offenses.[89]

---

[86] *Id.* Compare *Moore v. State*, 2018 WL 2427592, at *2 (Del. 2018) (stating that, "[w]e recognize that there are cases where the prosecution rests on nothing more than the discovery of the defendant's fingerprint in a place and under circumstances where it is equally likely to have been left under innocent circumstances as during the commission of the crime," but finding that, "as the record shows, this is not such a case.").

[87] 227 A.3d 1079 (Del. 2020).

[88] *Id.* at 1095.

[89] *See also Couch v. State*, 823 A.2d 491, 2003 WL 21054789, at *2 (Del. 2003) (TABLE) (distinguishing *Monroe* where police found the defendant's fingerprints on the inside of a front door of a store that was robbed and on a can of "Murray's Hair Dressing Pomade" that the suspect had placed on the counter, and explaining that there was "a significant amount of circumstantial evidence identifying Couch as the robber."). In *Couch*, both victims described the defendant and stated that they saw the defendant, who had a conspicuous mole on his cheek, touch the can. The likelihood that the defendant had innocently touched the can before the robbery was "too remote to be coincidental." *Id.* The clerk behind the counter testified that the store rarely had "in-and-out traffic" and that he did not recognize Couch to be a regular customer. *Id.* The "manner of

In addition to the palmprint and video surveillance evidence, the State contends that Detective McDerby's post-arrest interview of Pierce is further evidence of Pierce's guilt. The video of the interview was played for the trial court and entered into evidence without objection. During that interview, Pierce asked what evidence the police possessed that he robbed a liquor store prior to being told that the police were investigating the robbery of a liquor store.[90] We agree with the State that the interview does weigh in the balance in favor of the State.

Also, during the interview, Pierce claimed that he could not recall whether he had ever been to Silverside Discount Liquors but stated it was possible he might have been. Kalyauapu testified that he knows nine out of ten customers and that he had never seen Pierce in the store.[91] This evidence also favors the State.

Finally, the surveillance videos from both the First and Second Robberies show that the robber is of a similar build to Pierce. The videos also show similarities in the actions and mannerisms between the perpetrator who committed the First Robbery and the perpetrator who committed the Second Robbery. Based on the record and the totality of the circumstances in this case, we conclude that there was sufficient evidence from which

---

placement" of the prints in *Couch* showed that they were placed during the crime. The court concluded that a rational trier of fact could have identified the defendant as the robber beyond a reasonable doubt.

[90] Pierce responds that Detective McDerby began to ask, "have you ever been to" and then paused, looked at a paper, and then asked, "have you ever been to Silverside Discount Liquors?" Although the video does show that Detective McDerby looked at the paper before asking that question, he also looked at his paper and took notes throughout the interview.

[91] A60 (Kalyanapu Testimony).

a rational trier of fact could find beyond a reasonable doubt that Pierce robbed Silverside

Discount Liquors on both occasions.

*IV.    Conclusion*

For the reasons stated, the judgment of the Superior Court is **AFFIRMED**.